Alan E. Wisotsky – State Bar No. 68051
James N. Procter II – State Bar No. 96589
Brian P. Keighron – State Bar No. 71445
WISOTSKY, PROCTER & SHYER
300 Esplanade Drive, Suite 1500
Oxnard, California 93036
Phone:  (805) 278-0920
Facsimile: (805) 278-0289
Email:  bkeighron@wps-law.net

Attorneys for Defendants,
    CITY OF OXNARD, OXNARD POLICE
    DEPARTMENT, JERI WILLIAMS, STEVEN
    RAMIREZ, MICHAEL BOCANEGRA,
    ROSLYNN WILFERT, PEDRO RODRIGUEZ,
    AARON ZAVALA, KYLE BRANTNER, and
    MATTHEW ROSS

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUILLERMO RAMIREZ, an individual and successor-in-interest to ROBERT RAMIREZ, deceased; TERESA RAMIREZ, an individual and successor-in-interest to ROBERT RAMIREZ, deceased; R.R. [name redacted], a minor and successor-in-interest to ROBERT RAMIREZ, deceased, by and through his Guardian Ad Litem and Mother, LUCINA GARCIA,<br><br>        Plaintiffs,<br><br>        v.<br><br>OXNARD POLICE DEPARTMENT, CITY OF OXNARD, CHIEF JERI WILLIAMS, an individual, STEVEN RAMIREZ, an individual, MICHAEL BOCANEGRA, an individual, ROSLYNN WILFERT, an individual, PEDRO RODRIGUEZ, an individual, AARON ZAVALA, an individual, KYLE BRANTNER, an individual, MATTHEW ROSS, an individual, and DOES 1-10, inclusive,<br><br>        Defendants. | CASE NO. CV13-01615-MWF-AN<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[FRCP 56(b)]<br><br>[Filed concurrently with statement of uncontroverted facts and conclusions of law, supporting evidence, proposed order, and proposed judgment]<br><br>Date:   December 8, 2014<br>Time:   10:00 a.m.<br>Ctrm:  1600<br>Judge: Michael W. Fitzgerald |

i

TO PLAINTIFFS GUILLERMO RAMIREZ, TERESA RAMIREZ, AND R.R., A MINOR BY AND THROUGH HIS GUARDIAN AD LITEM AND MOTHER, ANTONIO ANGUIANO CERVANTES, AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 8, 2014, at 10:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 1600 of the above-entitled court, located at 312 N. Spring Street, Los Angeles, California, Hon. Michael W. Fitzgerald, judge presiding, defendants CITY OF OXNARD, OXNARD POLICE DEPARTMENT, JERI WILLIAMS, STEVEN RAMIREZ, MICHAEL BOCANEGRA, ROSLYNN WILFERT, PEDRO RODRIGUEZ, AARON ZAVALA, KYLE BRANTNER, and MATTHEW ROSS will and hereby  do move for summary judgment or, in the alternative, summary adjudication pursuant to Federal Rules of Civil Procedure, Rule 56(b).

This motion is based upon the following grounds:

1.      The force used by the individual defendants at the time of the incident was reasonable and  lawful and their efforts to restrain and control Mr. Ramirez were in good faith;

2.      The individual defendants are entitled to qualified immunity because they could have believed that their conduct at the time of the incident was lawful in light of clearly established law and the information possessed by them;

3.      Defendants did not act in a negligent manner nor did they violate or breach any duty to the decedent;

4.      The conduct of the defendants does not "shock the conscious" or "violate the decencies of civilized conduct" and therefore they did not violate the Fourteenth Amendment's substantive due process clause; and

5.      There is no evidence to support a *Monell* claim, or any claim against Police Chief Jeri Williams, the City of Oxnard or the Oxnard Police Department.

/ / /

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

1        This motion is based upon this notice, the attached Memorandum of Points and

2   Authorities, the exhibits filed concurrently herewith, the complete records and file in

3   this action and upon all other evidence that may be received at the hearing of the

4   motion.

5        This motion is made following the conference of counsel pursuant to Local

6   Rule 7-3, which took place on October 24, 2014, and thereafter.

7

8   DATED:  November 6, 2014                    WISOTSKY, PROCTER & SHYER

9

10                                                         By: _____

11                                                         Alan E. Wisotsky
                                                           James N. Procter II
12                                                         Brian P. Keighron
                                                           Attorneys for Defendants,
13                                                         CITY OF OXNARD, OXNARD POLICE
                                                           DEPARTMENT, JERI WILLIAMS,
14                                                         STEVEN RAMIREZ, MICHAEL
                                                           BOCANEGRA, ROSLYNN WILFERT,
15                                                         PEDRO RODRIGUEZ, AARON ZAVALA,
                                                           KYLE BRANTNER, and MATTHEW ROSS

16

17

18

19

20

21

22

23

24

25

26

27

28

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

## **TABLE OF CONTENTS**

**PAGE**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   v

Memorandum of Points and Authorities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

I.     Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.    Plaintiffs' Second Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . .   6

III.   Summary of Defendants' Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

IV.    Summary Judgment Standard  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

V.     Defendants are Entitled to Judgment  as a
       Matter of Law as to the First, Second and
       Seventh Claims for Violation of Civil Rights
       (42 U.S. C. §1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

VI.    Even if the Defendants Use of Force Was
       Unreasonable, They Are Entitled to the
       Defense of Qualified Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

VII.   There was no Violation of the Plaintiffs
       Fourteenth Amendment Rights in this
       Case (Claims 2, 7, 8 and 9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

VIII.  Defendants are Entitled to Judgment as
       a Matter of Law as to the Fifth and Sixth
       Claims for Assault and Battery and the
       Tenth Claim for Wrongful Death (Negligence) . . . . . . . . . . . . . . . . .   21

IX.    The City of Oxnard and the Oxnard Police
       Department are Entitled to Judgment as a
       Matter of Law as to the Third, Fourth,
       Eighth and Ninth Claims Based on *Monell*
       Liability  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

X.     Chief Williams is Entitled to Judgment as a
       Matter of Law as to All Claims Against Her . . . . . . . . . . . . . . . . . . . .   24

XI.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

1

# TABLE OF AUTHORITIES

2

PAGE

3

## FEDERAL CASES

4

*Anderson v Liberty Lobby, Inc.,*
        477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

5

6

*Blood v Shaefer*
        367 Fed. Appx.  315 (3rd Cir. 2010)  . . . . . . . . . . . . . . . . . . . . . . .   14

7

*Brousseau v Haugen*
        543 U.S. 194 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

8

*Celotex Corp. v Catett*
        477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,10

9

*Christie v Lopa*
        176 F.3d 1231 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

10

11

*City of Canton v Harris*
        484 U.S. 378 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

12

13

*City of Oklahoma v Tuttle*
        471 U.S. 808 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

14

*County of Sacramento v Lewis*
        523 U.S. 833 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23

15

16

*Devereaux v Abbey*
        263 F.3d 1070 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 17

17

*Drummond v City of Anaheim*
        343 F.3d (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17

18

19

*Estate of Ford v Ramirez-Palmer*
        301 F.3d 1043 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

20

*Estate of Phillips v City of Milwaukee*
        123 F.3d 586 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

21

22

*Forrester v City of San Diego*
        25 F.3d 804 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

23

*Graham v Connor*
        490 U.S. 386 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

24

*Graves v City of Coeur d'Alene*
        339 F.3d 828 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

25

26

*Groh v Ramirez*
        540 U.S. 551 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

27

28

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

*Harlow v Fitzgerald*
   457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Jeffers v Gomez*
   26 F.3d 895 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Johnson v County of Los Angeles*
   340 F.3d 895 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Kopec v Tate*
   361 F.3d 772 (3rd Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*KRL v Moore*
   384 F.3d 1105 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Larez v City of Los Angeles*
   946 F.2d 630 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Lemire v Cal. Dept. of Corrections and Rehabilitation*
   726 F.3d 1062 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Monell v New York Dept. of Social Services*
   436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 22, 23

*Motely v Parks*
   432 F.3d 1072 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Nissan Fire & Marine Industries Co., Ltd., v Fritz Companies, Inc.*
   210 F.3d 1099 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Pearson v Callahan*
   555 U.S. 223 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Pembaur v City of Cincinnati*
   475 U.S. 469 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Porter v Osborn*
   546 F.3d 1131 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Saman v Robbins*
   173 F.3d 1150 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Saucier v Katz*
   533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Schwenk v Hartford*
   204 F.3d 1187 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Sorrels v McKee*
   290 F.3d 965 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Vorland v Las Vegas Metropolitan Police Department*
   159 F.3d 365 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

1

**STATE CASES**

2

*Brown v Ransweiler*
    171 Cal.App.4th 516 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

3

*Edson v City of Anaheim*
    63 Cal.App.4th 1269 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

4

*Hayes v County of San Diego*
    57 Cal. 4th 622 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

5

*Munoz v City of Union City*
    120 Cal.App.4th 1077 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

6

7

8

9

**STATUTES**

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 22

10

California Penal Code §240 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

11

California Penal Code §242 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

12

**RULES**

F.R.C.P. 12(b)(6)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

13

F.R.C.P. 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

14

F.R.C.P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 18

15

F.R.C.P. 56(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

16

17

18

19

20

21

22

23

24

25

26

27

28

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

On the evening of June 23, 2012, at 10:40 p.m., Arturo Pedro called Oxnard Police Department 911 regarding a "Robert" who had swallowed an "eight ball of meth" and who was "bouncing off the walls." Mr. Pedro reported that the man needed medical attention but that the dispatcher should "send the police first." The 911 operator dispatched police and fire units to the scene. (Undisputed Fact 1 [hereinafter "UF"]) Gold Coast Ambulance and fire personnel arrived at the scene. Pursuant to protocol, the ambulance and fire department staged around the corner, awaiting word from the police that it was safe to enter the scene and render medical treatment. (UF 2)

Officer Michael Bocanegra was the first officer to arrive at the scene. Officer Bocanegra spoke with a bystander, who told him that Mr. Ramirez swallowed an eight ball of methamphetamine. The bystander, believed to be the reporting party, Mr. Pedro, pointed out Mr. Ramirez, who at that point was in the porch area at 1174 South L Street. (UF 3) Officer Bocanegra approached Mr. Ramirez, who was pacing back and forth on the porch wearing shorts and sneakers and not wearing a shirt. He appeared very agitated and was talking incoherently and continually balling his hands into fists. Because Mr. Ramirez appeared to be "amped up," and under the influence of drugs, Officer Bocanegra withdrew his Taser from his duty belt. (UF 4)

Officer Bocanegra verbally tried to calm Mr. Ramirez down. Officer Bocanegra talked to Mr. Ramirez and asked him, "What's going on? We're trying to help." Officer Bocanegra had received Crisis Intervention Team (CIT) training and spoke to Mr. Ramirez in a calm voice. Officer Bocanegra also turned on his PUMA recording device and kept it on during the incident. (UF 5)

Officer Kyle Brantner next arrived at the scene. Officer Brantner observed Mr. Ramirez to be very agitated, pacing back and forth, and constantly pointing and

flailing his arms.  He noticed that Mr. Ramirez appeared to be sweating and his body was shaking.  Officer Bocanegra was continually talking to Mr. Ramirez.  Because Mr. Ramirez appeared to be extremely under the influence of drugs and acting in an erratic manner, Officer Brantner used his radio to request the assistance of additional officers.  (UF 6)

Officer Bocanegra suggested to Officer Brantner that he should put on his latex gloves in the event they had to go "hands on" with Mr. Ramirez.  Officer Brantner also took his collapsible baton out of his belt for officer safety in the event that Mr. Ramirez suddenly attacked either the officers or the witnesses who were standing nearby.  (UF 7)

The next officer to arrive at the scene was Sgt. Steven Ramirez, who observed Mr. Ramirez to be very agitated and sweating profusely  Sgt. Ramirez also has CIT training.  Sgt. Ramirez told Robert Ramirez that he was not in trouble and that the police were only there to get him help and that the ambulance was just down the street.  He repeatedly asked Mr. Ramirez to lie down on his stomach so that they could get him medical treatment.  He told Mr. Ramirez to relax so they could get him help but that, for everyone's safety, he needed to lie down on his stomach.  Mr. Ramirez did not respond to or comply with any of Sgt. Ramirez' requests.  (UF 8)

Officers Pedro Rodriguez and Roslynn Wilfert next arrived on the scene. Officer Rodriguez began speaking to Mr. Ramirez in Spanish and asked him in Spanish to lie down on his stomach.  Mr. Ramirez did not respond or comply with any of the commands given to him in Spanish by Officer Rodriguez.  (UF 9)

Officer Matt Ross and Officer Aaron Zavala then arrived on scene.  Officer Ross also has CIT training.  Mr. Ramriez was still visibly agitated and sweating profusely.  Mr. Ramirez was making odd noises .  He appeared to be severely under the influence of drugs.  (UF 10)

While Mr. Ramirez was seated on the porch step, Sgt. Ramirez informed the other officers of the need to go "hands on" with Mr. Ramirez to enable medical

- 2 -

personnel to treat him.  Sgt. Ramirez directed Officers Rodriguez and Wilfert to make contact with Mr. Ramirez.  Officers Bocanegra and Brantner were to remain in front of Mr. Ramirez in the event Mr. Ramirez attempted to run away.  (UF 11)

While Mr. Ramirez was sitting on the porch step, Officer Rodriguez put his hand on Mr. Ramirez's left shoulder and left arm in an attempt to put Mr. Ramirez' arm in a control hold.  Mr. Ramirez immediately started to rise.  Officer Rodriguez said "Calmado" several times to calm Mr. Ramirez down.  After Mr. Ramirez stood up, he moved forward and slid out of Officer Rodriguez's grasp.  (UF 12)   Officers attempted to grab Mr. Ramirez's arms and legs.  Mr. Ramirez struggled with them, moving forward approximately five to seven feet.  Mr. Ramirez was then taken to the ground on his stomach with the officers holding on to his body.  (UF 13)

After Mr. Ramirez was placed on the ground, he violently struggled and yelled and was thrashing his body up and down and kicking his legs.  The right side of his face was on the concrete driveway and he was scraping his face and banging his head on the driveway.  Officer Zavala put his hand on Mr. Ramirez' head to keep it from banging on the ground.  (UF 14)  Officer Ross knelt on Mr. Ramirez's right leg and used both of his hands to keep his right leg from kicking.   Officer Rodriguez straddled Mr. Ramirez's left leg to prevent his left leg from kicking.  (UF 15)

The officers tried to get Mr. Ramirez' arms behind his back to handcuff him. Mr. Ramirez continuously resisted being handcuffed.  Officer Zavala put his weight on Mr. Ramirez' right shoulder for about 20 seconds to keep his right arm from flailing.  Sgt. Ramirez took hold of Mr. Ramirez' right arm and put it behind Mr. Ramirez' back.  Officer Rodriguez handcuffed the right hand.  (UF 16)   Officer Rodriguez handed the handcuff to Officer Wilfert, who initially put her right knee on the center low back area of Mr. Ramirez' back.  She had her knee in that position for approximately 20 seconds.  (UF 17)

/ / /

/ / /

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

Mr. Ramirez arched his back up and began pushing up and trying to get off the ground. Officer Wilfert repositioned her right knee towards his center back in an effort to keep him on the ground. She took her right knee off Mr. Ramirez' back before his left hand was handcuffed. Her right knee was on Mr. Ramirez' back for a total time of less than one minute. (UF 18)

Mr. Ramirez' left hand was underneath his body. Officer Brantner was kneeling on the ground to the left side of Mr. Ramirez' body and tried to pull his left hand out from underneath his body but was unable to do so. Officer Zavala, who was on Mr. Ramirez' right side, put his hand underneath Mr. Ramirez' body to push Mr. Ramirez' left hand towards Officer Brantner.   (UF 19)  Because Mr. Ramirez' arm was not coming out, Officer Brantner put his baton in the crook of Mr. Ramirez' left elbow to "pry" his arm out. This proved successful and the officers were able to get his right arm behind Mr. Ramirez' back and handcuff it. Mr. Ramirez continued yelling during this process. The entire handcuffing process for both hands took about a minute and thirty seconds. (UF 20)

Officer Bocanegra crouched near Mr. Ramirez's left shoulder and held his Taser against Mr. Ramirez's shoulder in a drive-stun mode in the event Mr. Ramirez was able to get up. Officer Bocanegra never activated his Taser during the incident nor did he put any weight on Mr. Ramirez' body. (UF 21)

After Mr. Ramirez's hands were handcuffed, he continued to wildly kick his legs and feet. Officer Wilfert had a nylon hobble device in her pocket. Officer Ross and Officer Wilfert applied the hobble device in the area of Mr. Ramirez' ankles to stop him from kicking his feet. (UF 22)

During the process of hobbling Mr. Ramirez' legs together, Officer Rodriguez, who had been straddling Mr. Ramirez' left leg, got his right leg caught between Mr. Ramirez' legs. Officer Rodriguez' leg was being squeezed by Mr. Ramirez' legs. It took about 20 seconds for Officer Rodriguez to extract his legs from between Mr. Ramirez' legs.   (UF 23)   Mr. Ramirez continued to struggle even after being

- 4 -

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

handcuffed and his feet being hobbled together.  Officer Ross suggested that a body wrap system be used and Sgt. Ramirez directed an officer to retrieve a body wrap system from a patrol unit.  (UF 24)

About 30 seconds after the hobble had been placed, an officer stated that Mr. Ramirez appeared to not be breathing.  Officer Wilfert and Sgt. Ramirez felt for a pulse and believed they felt a pulse.  Officer Zavala and Sgt. Ramirez immediately turned Mr. Ramirez onto his right side.  Sgt. Ramirez and Officer Rodriguez saw Mr. Ramirez appear to take a breath.  Fire and ambulance personnel were immediately summoned to the scene by Sgt. Burr.  Officer Wilfert began a sternum rub.  Officer Bocanegra ran to get a CPR mask out of his vehicle.  (UF 25)

Fire and ambulance personnel, including Paramedic Jaime Villa, arrived at the scene.  They requested that the handcuffs be removed.  The handcuffs were removed within 30 to 60 seconds.  Fire and ambulance treated Mr. Ramirez.  His heart had pulseless electrical activity and he was not breathing.  (UF 26)

Mr. Ramirez was transported to the hospital.  He is pronounced dead at the hospital.  His body temperature at the hospital was 105.6 degrees.  (UF 27)

An autopsy was conducted by Ventura County Medical Examiner Ronald O'Halloran, M.D.  A plastic baggie containing methamphetamine and a plastic baggie containing marijuana were found in Mr. Ramirez' stomach.  (UF 28)  The amount of methamphetamine found in Mr. Ramirez' blood and from the autopsy were consistent with his having swallowed an "eight-ball" of methamphetamine.  His methamphetamine blood level was 8.185Ng/ml at the hospital and approximately 10,075 Ng/ml at autopsy.  The methamphetamine level in his stomach was 3,145,000 Ng/ml.  The methamphetamine level was very high.  (UF 29)

Mr. Ramirez' body temperature at the hospital was 105.6 degrees.  Anything over 105 degrees is considered critical.  (UF 30)  EMTs could not have done anything at the scene to alleviate the potential for Mr. Ramirez to die from the overdose of methamphetamine.  (UF 31)

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

- 5 -

1    Oxnard Police Department officers meet or exceed the training standards of
2 POST (Commission on Police Officer Standards and Training) and the Oxnard Police
3 Department provides its officers with exceptional ongoing training.  (UF 32)  The
4 Oxnard Police Department does not have any policy, practice or procedure of
5 indifference to any person who might need medical care.  (UF 33)  The Oxnard
6 Police Department does not have any policy, custom or practice of condoning officers
7 use of excessive force against citizens.  (UF 34)  The Oxnard Police Department has
8 no policy, practice or procedure of failing to supervise the employees of the Oxnard
9 Police Department or failing to screen qualified persons for the position of police
10 office within the City of Oxnard. (UF 35)     There is no evidence that the Oxnard
11 Police Department fails to investigate citizen's complaints against their personnel.
12 (UF 36)

**II.**

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

15    On July 22, 2013, the plaintiffs filed a second amended complaint and alleged
16 ten claims for relief against the defendants.

17 ***Survival Claims***:

18    1.    42 U.S.C. §1983/Fourth Amendment rights violation for use of excessive
19 and deadly force;

20    2.    42 U.S.C. §1983/Fourth and Fourteenth Amendment claim for civil rights
21 violation for deliberate indifference to medical needs;

22    3.    42 U.S.C. §1983 *Monell* liability for deliberate indifference;

23    4.    42 U.S.C. §1983 *Monell* liability for failure to screen, train, supervise, and
24 reprimand employees;

25    5.    State claim for assault;

26    6.    State claim for battery.

27 ***Individual  Claims***:

28    7.    42 U.S.C. §1983/Fourteenth Amendment claim for interference with

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

1  familial relationship;

2       8.    Fourteenth Amendment *Monell* claim based on deliberate indifference;

3       9.    Fourteenth Amendment *Monell* claim based on failure to screen, train,

4  supervise, and reprimand employees; and

5       10.   State claim for wrongful death.

6       The gist of the plaintiffs' factual allegations is that the individual officers used

7  excessive force on Mr. Ramirez, which resulted in him being "asphyxiated" and

8  causing his death.  The plaintiffs also assert "Monell" type claims against the entity

9  defendants and Chief Williams.

10      The plaintiffs are decedent's parents and a son who was born seven months

11  after the decedent died.  The decedent was unaware that his girlfriend was pregnant at

12  the time of this incident.

13                              **III.**

14            **SUMMARY OF DEFENDANTS' ARGUMENT**

15  Defendants contend that:

16      1.    Decedent, Robert Ramirez, had swallowed an eight ball of

17  methamphetamine[1]; as a result, he was sweating profusely, acting in a highly agitated,

18  paranoid and bizarre manner, hallucinating and posed a danger to himself and others;

19      2.    Mr. Ramirez' friend's brother called 911 and advised the dispatcher of

20  Mr. Ramirez' "bouncing off the walls" behavior and advised that the police should be

21  called in first;

22      3.    The 911 dispatcher called police and emergency medical personnel;

23  pursuant to protocol, the fire and ambulance personnel staged down the street from

24  the incident awaiting notification from the police officers that it was safe to enter the

25  scene;

26  ───────────────

27  [1] An "eight ball" of methamphetamine is one-eighth of an ounce or 3.5 grams.  A typical dosage of methamphetamine is .1 grams.  The 3.5 grams swallowed by Mr. Ramirez constituted 35 times the typical dosage.

28

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

4.    The police officers who responded to the scene acted in a calm, professional and reasonable manner in attempting to verbally coax Mr. Ramirez to voluntarily place himself on the ground so they could restrain him and enable him to get medical treatment;

5.    After those efforts were unsuccessful, the officers acted in a reasonable and lawful manner to try to handcuff Mr. Ramirez; however, as soon as he was touched, Mr. Ramirez stood up and pulled forward in a berserk manner; the officers acted reasonably in taking him to the ground to handcuff and restrain him;

6.    While Mr. Ramirez was on the ground, he violently resisted their efforts to restrain him; the officers' efforts to restrain him were reasonable;

7.    As soon as Mr. Ramirez was noted to be not breathing, the officers checked his pulse, put him on his right side and immediately summoned medical personnel to the scene;

8.    The officers did not act in a negligent manner nor did they breach any duty of care to the plaintiff; and,

9.    The evidence does not support a *Monell* claim, or any claim, against Chief Jeri Williams, the City of Oxnard or the Oxnard Police Department.

## IV.

## **SUMMARY JUDGMENT STANDARD**

The court must grant a motion for summary judgment if the moving party shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *Anderson* 477 U.S. at 248.

The moving party bears the burden of informing the Court of the basis for its motion and identifying parts of the file which it believes indicate an absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essen-

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

1  tial element of the nonmoving party's claim or defense or show that the nonmoving

2  party does not have enough evidence of an essential element to carry its ultimate

3  burden of persuasion at trial." *Nissan Fire & Marine Industries Co., Ltd. v. Fritz*

4  *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  See also *Devereaux v. Abbey*,

5  263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of

6  proof at trial, the moving party need only point out 'that there is an absence of evi-

7  dence to support the nonmoving party's case.'" [quoting *Celotex*, 477 U.S. at 325]).

8      If the moving party meets its initial burden, the burden shifts to the nonmoving

9  party to produce evidence supporting its claims or defenses.  *Nissan Fire & Marine*,

10  *supra*, at 1103.  The nonmoving party may not rest upon mere allegations or denials

11  of the adverse party's evidence, but instead must produce admissible evidence that

12  shows there is a genuine issue of material fact for trial.  See *Devereaux*, 263 F.3d at

13  1076.  If the non-moving party does not produce evidence to show a genuine issue of

14  material fact, the moving party is entitled to summary judgment.  See *Celotex* 477

15  U.S. at 323.  "One of the principle purposes of the summary judgment rule is to

16  isolate and dispose of factually unsupported claims and defenses, and we think it

17  should be interpreted in such a way that allows it to accomplish that purpose."

18  *Celotex* at 324.

19                                   **V.**

20            **DEFENDANTS ARE ENTITLED TO JUDGMENT AS**

21            **A MATTER OF LAW AS TO THE FIRST, SECOND**

22            **AND   SEVENTH   CLAIMS   FOR   VIOLATION   OF**

23            **CIVIL RIGHTS (42 U.S.C. §1983)**

24      **A.      From the Perspective of a Reasonable Officer, Defendants' Use of**

25  **Force was Objectively Reasonable Under the Circumstances.**

26            A review of each individual officers' conduct reveals that they did not

27  violate Mr. Ramirez' constitutional rights.

28  / / /

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

1           1.     <u>Officer Michael Bocanegra</u>:   Officer Bocanegra was the first

2    officer on scene.  When he approached Mr. Ramirez, he was acting very bizarrely,

3    sweating profusely, talking incoherently and pacing back and forth in an agitated

4    manner.  Officer Bocanegra tried to calm Mr. Ramirez down verbally to no avail.

5    Officer Bocanegra took out his Taser for officer safety.

6          Officer Bocanegra did not participate in the initial physical contact with Mr.

7    Ramirez or the take down to the ground. He kept his Taser out in the event Mr.

8    Ramirez broke loose from the officers.

9          Once Mr. Ramirez was on the ground, Officer Bocanegra placed his Taser

10   against the right shoulder of Mr. Ramirez but never deployed it.  Officer Bocanegra

11   never put any weight on Mr. Ramirez' body.

12          2.     <u>Officer Kyle Brantner</u>:   Officer Brantner was second on scene.

13   When he observed Mr. Ramirez' bizarre behavior, he took out his collapsible baton

14   for officer safety.  He stood to the side while the other officers went "hands-on" with

15   Mr. Ramirez and placed him on the ground.

16         After Mr. Ramirez was on the ground, Officer Brantner used his baton as a

17   lever by placing it in the crook of Mr. Ramirez' left elbow to pry Mr. Ramirez' left

18   arm out from underneath his body.  He then went down to the feet area to hold Mr.

19   Ramirez' feet and legs from kicking.  Officer Brantner did not place any weight on

20   Mr. Ramirez' body during the incident.

21          3.     <u>Sgt. Steven Ramirez</u>:   Sgt. Ramirez was the third officer on

22   scene and was also the supervising officer.  He spoke to Mr. Ramirez in a calm

23   manner and asked him numerous times to lay down on his stomach voluntarily so that

24   fire and ambulance could come in and treat him.  After attempting to get Mr. Ramirez

25   to lay on the ground, it became apparent that Mr. Ramirez either would not or could

26   not do so.  Sgt. Ramirez then directed the other officers to go "hands-on" to restrain

27   him so he could get medical attention.   He also assisted them in taking Mr. Ramirez

28   to the ground.

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

1    While Mr. Ramirez was struggling with the officers on the ground, Sgt.

2    Ramirez placed his weight on Mr. Ramirez' right arm and shoulder in order to control

3    the arm so that Mr. Ramirez' right hand could be placed behind his back to be

4    handcuffed.   When it was noted that Mr. Ramirez was not breathing, Sgt. Ramirez

5    checked for a pulse and immediately put Mr. Ramirez onto his right side.

6    Sgt. Ramirez only put weight on Mr. Ramirez' right arm and shoulder area for

7    the purpose of controlling a subject who was struggling and resisting the officers

8    efforts to handcuff and restrain him.   He took his weight off Mr. Ramirez after he

9    stopped resisting.   Sgt. Ramirez' conduct was reasonable under the circumstances.

10    4.   Officer Pedro Rodriguez:    Officer Rodriguez spoke to Mr.

11    Ramirez in Spanish in an effort to communicate with him.   When it was clear that Mr.

12    Ramirez would not comply with the officers' requests that he get voluntarily on the

13    ground, Officer Rodriguez, at the request of Sgt. Ramirez, walked on the porch

14    behind Mr. Ramirez and tried to take hold of his left arm in order to put a control

15    hold on him so that he could be handcuffed.

16    When Officer Rodriguez touched Mr. Ramirez, Mr. Ramirez stood up, acted

17    berserk and started going forward.   Officer Rodriguez said "Calmado" (be calm),

18    several times to Mr. Ramirez to no avail.   Officer Rodriguez assisted in the taking

19    down of Mr. Ramirez to the ground and straddled Mr. Ramirez' left leg while he was

20    on the ground.  He also assisted in handcuffing him. The only     weight        Officer

21    Rodriguez put on Mr. Ramirez was on his left leg.   He took his weight off of Mr.

22    Ramirez after he stopped resisting.   The placement of weight on Mr. Ramirez' left leg

23    was reasonable and did not asphyxiate Mr. Ramirez as alleged by plaintiff.

24    5.   Officer Roslynn Wilfert:    Officer Wilfert assisted in taking

25    Mr. Ramirez to the ground.   After he was on the ground, Officer Wilfert assisted in

26    getting his left hand behind his back.   In the course of doing so, she placed her right

27    knee on Mr. Ramirez' low back and then repositioned her right knee over the mid

28    back area.  Officer Wilfert weighed 140 pounds at the time of the incident.  She had

- 11 -

her knee on Mr. Ramirez' back for less than a minute.  Mr. Ramirez was shouting and struggling throughout that time and afterward.  Thus, there is no evidence that he was "asphyxiated" while she had her knee on his back.

Because Mr. Ramirez was wildly kicking his legs after he was handcuffed, she then assisted Officer Ross in an effort to try to control Mr. Ramirez' legs.  She took a nylon hobble out of her pocket and assisted in tying his ankles together.

After it was noted that Mr. Ramirez had stopped breathing, Officer Wilfert immediately checked his pulse and believed that she felt a pulse.  She then gave him a "sternum rub" to revive him.  She acted reasonably throughout the incident.

6.     Officer Matt Ross:      Officer Ross placed his knees and hands on top of Mr. Ramirez' right calf to keep him from kicking his legs.  After Mr. Ramirez was handcuffed, he and Officer Wilfert applied the nylon hobble around Mr. Ramirez' ankle area.  His actions were reasonable under the circumstances.

Officer Ross only put weight on Mr. Ramirez' right leg.  Any weight placed by Officer Ross on Mr. Ramirez' leg did not cause him to be "asphyxiated" as the plaintiffs claim.

7.     Officer Aaron Zavala:      Officer Zavala assisted in the take down of Mr. Ramirez and landed on the ground near Mr. Ramirez' right shoulder.  He then placed his knee on Mr. Ramirez' right shoulder to keep Mr. Ramirez from flailing his right arm around so that it could be handcuffed.

Officer Zavala assisted Officer Brantner in getting Mr. Ramirez' left arm from underneath his body by reaching under Mr. Ramirez' body and pushing Mr. Ramirez' left arm toward Mr. Ramirez' left side.  This was done to get Mr. Ramirez' left arm out from under his body so he could be handcuffed.  Officer Zavala took his knee off of Mr. Ramirez' right shoulder after Mr. Ramirez stopped resisting.

Officer Zavala observed Mr. Ramirez' head to be scrapping the concrete driveway so Officer Zavala put his hand on Mr. Ramirez' left ear area to keep Mr. Ramirez' head steady so he did not keep scraping it on the concrete.  After an officer

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

- 12 -

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

1  stated that Mr. Ramirez was not breathing, Officer Zavala pulled Mr. Ramirez onto

2  his right side.   Officer Zavala then placed his hand under the right side of Mr.

3  Ramirez' head to keep it parallel with his body.  Officer Zavala's placing his knee on

4  Mr. Ramirez' right shoulder did not contribute to any alleged "asphyxiation" of Mr.

5  Ramirez.

6      Sgt. Terry Burr (a non-defendant) was standing by while the other officers

7  were attempting to control and restrain Mr. Ramirez.  As soon as one of the officers

8  noted that Mr. Ramirez was not breathing, Sgt. Burr summoned the fire and

9  ambulance personnel to enter the scene to treat Mr. Ramirez.

10      The key question is "whether the officers' actions are 'objectively reasonable'

11  in light of the facts and circumstances confronting them, without regard to their

12  underlying intent or motivation."  *Graham v Connor*, 490 U.S. 386, 397 (1989).  As

13  explained in *Forrester v City of San Diego*, 25 F.3d 804, 807-808 (9th Cir. 1994),

14  "Police officers . . .are not required to use the least intrusive degree of force possible.

15  Rather, . . .the inquiry is whether the force that was used to effect a particular seizure

16  was reasonable, viewing the facts from the perspective of a reasonable officer on the

17  scene."

18      In the instant case, the officers were confronted with a situation where the

19  subject, age 25, was severely "amped up," sweating profusely, clenching and

20  unclenching his fists in an extremely agitated manner and was speaking incoherently.

21  He posed not only a threat to the police officers but also to himself in that he was in

22  serious need of medical treatment.  The officers acted reasonably in their belief that

23  the only way Mr. Ramirez would receive medical treatment was if they (the officers)

24  were able to restrain him so that the medical responders could safely approach him

25  for treatment.  As can be seen above, all of the officers' actions were for the purpose

26  of restraining Mr. Ramirez so that he could  get medical attention.   There is no

27  evidence that any of the officers intentionally tried to hurt Mr. Ramirez.  They acted

28  reasonably under the circumstances and acted in good faith.  They did not violate Mr.

- 13 -

1   Ramirez' constitutional rights.

2         The officers' concerns that Mr. Ramirez would not voluntarily submit to

3   medical treatment were confirmed when they first touched him and he reacted in a

4   violent and physically resistive manner.   At that point, it was reasonable for the

5   officers to try to secure Mr. Ramirez to enable him to be medically treated.

6         The officers made the decision that the best way to restrain Mr. Ramirez and

7   enable the medical responders to treat him initially was to secure his arms with

8   handcuffs.  Handcuffing, by itself, is not a show of excessive force.  *Blood v Shaefer*,

9   367 Fed. Appx. 315,319 (3rd Cir. 2010)(citing *Kopec v Tate*, 361 F.3d 772,778 (3rd

10  Cir. 2004)).

11        When Mr. Ramirez resisted being handcuffed, the officers then acted

12  reasonably in attempting to bring him to the ground in order to handcuff him.  The

13  officers grabbed Mr. Ramirez' arms and legs and took him to the ground while

14  holding on to him.   This is not a case where the officers slammed the subject to the

15  ground with the intent to injure him.  They held on to Mr. Ramirez and took him to

16  the ground for the purpose of restraining and handcuffing him.  After they handcuffed

17  him, he wildly kicked his legs and it became necessary to put the nylon hobble

18  around his ankles.

19        In short, once Mr. Ramirez was on the ground, the officers acted in an

20  objectively reasonable manner to control the arms and legs of an extremely agitated

21  subject who was using all of this strength and power to resist the officers.

22  Throughout this incident, the officers used reasonable force in a good faith attempt to

23  restrain Mr. Ramirez so that he could get medical care.

24        **B.    The Facts of this Case are Clearly Distinguishable From the**

25  ***Drummond* Case.**

26        It should be noted that the Ninth Circuit has found constitutional violations

27  where prone and handcuffed individuals have suffocated under the weight of

28  restraining officers.  In *Drummond v City of Anaheim*, 343 F.3d 1052, 156-57 (9th

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

- 14 -

Cir. 2003).  The officers determined that they needed to take Mr. Drummond - - an individual with a history of mental illness – - into custody for his own safety.  The court acknowledged that some force was justified because of Mr. Drummond's potential danger to himself but that this need was mitigated by the lack of an underlying crime and his history of mental illness.  *Id.* at 1057-58.  The court then concluded that in balancing the need for force and the amount of force that was employed, "[t]he officers - - indeed, any reasonable person – should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." *Drummond* at 1059.    However, the distinctions between the *Drummond* and the instant case are striking.  Among the distinctions between the two cases are:

(1)    Unlike the police in *Drummond*, the officers here did not immediately use force upon encountering Mr. Ramirez but, rather, first attempted to verbally coax him into getting on the ground so that he could be medically treated.

(2)    Unlike the police in *Drummond*, the officers here had reasonable cause to believe that Mr. Ramirez posed a physical threat to them because he was acting in a very agitated and psychotic manner and his size and build (5'10", 205 pounds) posed a physical threat if he decided to charge at the officers.

(3)    Unlike the plaintiff in the *Drummond* case, Mr. Ramirez resisted the officers throughout the encounter; the fact that Mr. Drummond was compliant throughout the incident was a key factor in the Ninth Circuit finding that the police in *Drummond* had acted unreasonably.

(4)    Unlike the police in *Drummond*, the officers in this case ceased using force once Mr. Ramirez stopped resisting after being handcuffed and hobbled.  The police in *Drummond* continued to put their weight on Mr. Drummond's back and neck for 20 minutes until another officer arrived.  In this case, from the time Mr. Ramirez was placed on the ground until the time that medical personnel were summoned was less than four minutes.

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

(5)   In *Drummond*, although Mr. Drummond offered no resistance, one officer placed his knees into Mr. Drummond's back and the other officer also placed one knee on Mr. Drummond's back and one knee on Mr. Drummond's neck despite Mr. Drummond complaining repeatedly that he could not breathe and that the officers were choking him.  In the instant case, the officers had put their weight on Mr. Ramirez' extremities (right arm and shoulder and legs) and a female officer had her right knee on Mr. Ramirez' low back for less than one minute.

(6)   In *Drummond*, the court found that once Mr. Drummond was on the ground and not resisting the officers, there was little or no need to use further physical force.  In the instant case, after Mr. Ramirez was brought to the ground, he continuously resisted the officers' efforts to restrain him and once he stopped resisting, the officers ceased any use of force.

In the instant case, the appropriate focus in determining whether or not the decedent's constitutional rights were violated, is whether or not the conduct of each individual officer was reasonable in view of the facts and circumstances facing the officer at the time.  As set forth above, it is clear that the officers acted appropriately and reasonably in response to the circumstances presented to them at the time of the incident.

In addition, neither the decision to place Mr. Ramirez on his stomach, nor the decision to handcuff him behind his back nor the decision to bind his ankles constituted objectively unreasonable force.  The struggle had escalated to the point where such restraints were appropriate and Ramirez himself was the cause of the escalation.  In *Estate of Phillips v City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997), the Seventh Circuit addressed a situation in which the decedent actively resisted any attempt to subdue him.  *Id.* at 593.  The court held that it was reasonable to maneuver a resisting individual into a prone position and to restrain his legs, "given the peril posed by his continual kicking." *Id.*

/ / /

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

1    Consequently, and in consideration of all the factors outlined in *Graham v*

2  *Connor* and its progeny, it must be concluded that the force exerted upon Mr.

3  Ramirez was objectively reasonable and the officers did not violate Mr. Ramirez'

4  Fourth Amendment right to be free of the use of excessive force.

5                                                        **VI.**

6              **EVEN IF THE DEFENDANTS USE OF FORCE WAS**

7              **UNREASONABLE,  THEY ARE ENTITLED TO THE**

8                    **DEFENSE OF QUALIFIED IMMUNITY**

9        The defense of qualified immunity shields an officer from trial when the officer

10  "reasonably misapprehends the law governing the circumstances she confronted

11  'even if the officer's conduct was constitutionally deficient.'"  *Brousseau v Haugen*,

12  543 U.S. 194 (2004) (per curiam); *Motely v Parks*, 432 F.3d 1072, 1077 (9th Cir.

13  2005).

14        "Adoption of qualified immunity protects government officials 'from liability

15  for civil damages insofar as their conduct does not violate clearly established

16  statutory or constitutional rights of which a reasonable person would have known.'"

17  *Pearson v Callahan*, 555 U.S. 223,231 (2009) (quoting *Harlow v Fitzgerald*, 457

18  U.S. 800, 818 (1982)).  "Qualified immunity balances two important interests – the

19  need to hold public official accountable when they exercise power irresponsibly and

20  the need to shield officials from harassment, distraction, and liability when they

21  perform their duties reasonably." *Id.*  "The protection of qualified immunity applies

22  regardless of whether the government official's error is "a mistake of law, a mistake

23  of fact, or mistake based on mixed questions of law and fact.'"  *Id.*  (Quoting *Groh v*

24  *Ramirez*, 540 U.S. 551, 567 (2004)) (Kennedy, J. dissenting.)).

25        If an official could reasonably have believed his actions were reasonable in

26  light of clearly established law and the information he possessed at the time, he is

27  protected by qualified immunity.  *Saucier v Katz*, 533 U.S. 194, 202 (2001);

28  *Devereaux v Abbey*, 263 F.3d at 1074.

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

1       In *Saucier v Katz*, supra, the Supreme Court "mandated a two-step sequence

2   for resolving government officials' qualified immunity claims. *Id.* at 232. "First, a

3   court must decide that the facts that a plaintiff has alleged (see Fed Rules Civ. Proc.

4   12(b)(6)(c) or shown (see Rules 50, 56) make out a violation of a constitutional right.

5   *Id.* (citing *Saucier*, 533 U.S. at 201). This part of the inquiry "mirrors the substantive

6   summary judgment decision on the merits." *Sorrels v McKee*, 290 F.3d 965,969 (9th

7   Cir. 2002). "If no constitutional right would have been violated were the allegations

8   established," then the officer is entitled to qualified immunity. *Saucier* at 201.

9   "Second, if the plaintiff has satisfied the first step, the court must decide whether the

10   right at issue was "clearly established" at the time of defendant's alleged misconduct.

11   *Pierson* supra at 232. Qualified immunity is applicable unless the official's conduct

12   violated a clearly established constitutional right." *Id.* (citing *Anderson v Creighton*,

13   483 U.S. 635, 640 (1987)).

14       The Supreme Court has stated that the order in which these questions are

15   addressed is left to the lower courts' discretion. *Pierson*, 555 U.S. at 236. ([W]hile

16   the sequence set forth [in *Saucier*] is often appropriate, it should no longer be

17   regarded as mandatory. The judges of the district courts and the courts of appeals

18   should be permitted to exercise their sound discretion in deciding which of the two

19   prongs of the qualified immunity analysis should be addressed first in light of

20   circumstances in the particular case at hand.") The Supreme Court also stated that

21   the order used in *Saucier* "is often beneficial." *Id.*

22       The relevant dispositive inquiry for qualified immunity is whether it would

23   have been clear to the Oxnard officers in this case that their conduct while trying to

24   restrain a 5'10" 205 pound subject, who had consumed a tremendous amount of

25   methamphetamine and was acting out of control, was unlawful. There is no way that

26   a reasonable officer could have believed that placing Mr. Ramirez on the ground and

27   holding him down in order to handcuff his hands and hobble his feet together, so

28   paramedics could treat him, was unlawful.

1   Even if, as plaintiffs claim, they were on Mr. Ramirez for "too long," the
2   "concern of the immunity inquiry is to acknowledge that reasonable mistakes can be
3   made" and that it is "often difficult for an officer to determine how the relevant legal
4   doctrine will apply to the factual situation that he faces."  *Estate of Ford v Ramirez-*
5   *Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002).  Thus, qualified immunity "provides
6   ample protection to all but the plainly incompetent or those who knowingly violate
7   the law." *KRL v Moore*, 384 F.3d 1105, 1116 (9th Cir. 2004); *Estate of Ford*, 301
8   F.3d at 1049.  The approach of the Ninth Circuit "has always been to 'determine
9   whether a reasonable officer could have believed lawful the particular conduct at
10   issue.'"  *Schwenk v Hartford*, 204 F.3d 1187, 1196 n.5 (9th Cir. 2000).

## VII.

## THERE WAS NO VIOLATION OF THE PLAINTIFFS' FOURTEENTH AMENDMENT RIGHTS IN THIS CASE (CLAIMS 2, 7, 8 AND 9)

15   Plaintiffs' claim that the defendants' use of force unconstitutionally violated
16   their rights to familial relationships in violation of the Fourteen Amendment.
17   Preliminarily, if the Court determines that there was no violation of the Fourth
18   Amendment regarding the conduct of the individual defendants, that also means that
19   summary judgment is appropriate as to the Fourteenth Amendment claims.  See
20   *Vorland v Las Vegas Metropolitan Police Department*, 159 F.3d 365, 371 note n.4
21   (9th Cir. 1998) (where officers' conduct was objectively reasonable, it does not
22   offend substantive due process).

23   The Fourteenth Amendment's substantive due process clause protects against
24   the arbitrary or oppressive exercise of government power. See *County of Sacramento*
25   *v Lewis*, 523 U.S. 833, 845-846 (1998).  Parents and children may assert Fourteenth
26   Amendment substantive due process claims if they are deprived of their liberty
27   interests in the companionship and society of their child or parent through official
28   conduct.  See *Lemire v Cal. Dept. of Corrections and Rehabilitation*, 726 F.3d 1062,

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

1  1075 (9th Cir. 2013) (parents and children).

2      The Due Process Clause is violated by executive action only when it can be
3  properly characterized as arbitrary, or conscious shocking, in a constitutional sense.
4  *County of Sacramento v Lewis*, 523 U.S. at 845-47; *Lemire* 726 F.3d at 1075.  The
5  cognizable level of executive abuse of power is that which "shocks the conscious" or
6  "violates the decencies of civilized conduct." *Id*. at 846.  Mere negligence or liability
7  grounded in tort does not meet the standard for a substantive due process violation.
8  *Id* at 849.  The *Lewis* case involved a high speed pursuit of a suspect on a motorcycle,
9  which ended in a police officer hitting and killing the suspect with a car.   In
10  determining that the police officer's conduct did not "shock the conscious," the
11  Supreme Court analogized the high speed chase to tense, rapidly evolving situations
12  such at prison riots.  *Id*. 852-53.  The court held that liability is judged on a higher
13  standard than deliberate indifference and turned on "whether force was applied in a
14  good faith effort to maintain or restore discipline or maliciously and sadistically for
15  the very purpose of causing harm. . ." *Id*. at 852-53.  "Purpose to harm" in this
16  context means acting with a purpose to harm the decedent for reasons unrelated to
17  legitimate law enforcement objectives.  See *Porter v Osborn*, 546 F.3d 1131, 1137
18  (9th Cir. 2008).  By contrast, the deliberate indifference standard is appropriately
19  used in custodial situations when the officials have more time to make decisions
20  about their actions. *Id*. at 1137-40.

21      The evidence in this case is that the situation was rapidly evolving and the
22  officers had to react quickly as Mr. Ramirez struggled.  Nothing these officers did to
23  Mr. Ramirez even remotely approaches conduct which shocks the conscious or
24  violated civilized standards of decency nor did it reach the level of deliberate
25  indifference necessary to establish a Fourteenth Amendment claim.

26  / / /
27  / / /
28  / / /

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
360 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

# VIII.

## <u>DEFENDANTS ARE ENTITLED TO JUDGMENT AS A</u>

## <u>MATTER OF LAW AS TO THE FIFTH AND SIXTH CLAIMS FOR</u>

## <u>ASSAULT AND BATTERY AND THE TENTH CLAIM FOR</u>

## <u>WRONGFUL DEATH (NEGLIGENCE)</u>

An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.  California Penal Code §240.  A battery is any willful and unlawful use of force or violence upon the person of another.  California Penal Code §242.  A *prima facie* claim for battery cannot be established unless it is proven that an officer used unreasonable force in making a lawful arrest or detention.  *Saman v Robbins*, 173 F.3d 1150, 1157, N.6 (9th Cir. 1999).

Federal civil rights claims of excessive force are the federal counterpart to state law battery and wrongful death claims; in both, the plaintiff must prove the unreasonableness of the officer's conduct.  *Munoz v City of Union City*, 120 Cal.App.4th, 1077, 1102 (2004).  The plaintiff bears the burden of proving the officer used unreasonable force.  *Edson v City of Anaheim*, 63 Cal.App.4th 1269, 1272 (1998).  Courts apply the same analysis used in federal excessive force claims to state law excessive force claims.  *Munoz* at 1102.  Where "the force used was not unreasonable [under the Fourth Amendment], the state law claim must fail." *Johnson v County of Los Angeles*, 340 F.3d 787, 794 (9th Cir. 2003).

As set forth above, the Oxnard officers' conduct in the instant case was objectively reasonable in light of the facts and circumstances confronting them.  Accordingly, the Court can find, as a matter of law, that the officers' use of force on the decedent was lawful and reasonable and enter judgment in favor of defendants on the assault and battery claims.

As to the wrongful death negligence state claim, in order to prove facts sufficient to support a finding of negligence, a plaintiff must show that the defendants

had a duty to use due care, and that the defendants breached that duty and that the breach was the approximate or legal cause of the resulting injury. *Hayes v County of San Diego*, 57 Cal.4th 622, 629 (2013). State negligence law, which considers the totality of the circumstances surrounding any use of deadly force, is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used. *Id.* at 639. Nonetheless, "[a]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she chose the 'most reasonable' action or that conduct that is least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence." *Brown v Ransweiler*, 171 Cal.App.4th 516, 537-538 (2009); *Hayes* 57 Cal.4th at 632.

As noted previously, the Oxnard defendants acted reasonably throughout this incident and the force they used on Mr. Ramirez was reasonable. There was no breach of any duty to the plaintiffs. There is no evidence of negligence. Because the force used by the officers was reasonable, summary judgment should be entered in favor of the defendants as to the wrongful death negligence claim.

## IX.
## THE CITY OF OXNARD AND THE OXNARD POLICE DEPARTMENT ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO THE THIRD, FOURTH, EIGHTH AND NINTH CLAIMS BASED ON *MONELL* LIABILITY

The basis for municipal liability under §1983 for civil rights violations is distinct from the individual officers' actions. There is no *respondeat superior* liability for the actions of a municipal employee. *Monell v New York Dept. of Social Services*, 436 U.S. 658, 694 (1978). Under United States Supreme Court case law, a municipality can be held liable for a constitutional violation under §1983 only if the

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

violation is a result of the municipality's official policies or customs or when it fails to train its officers. *Monell* at 694; *City of Canton v Harris*, 484 U.S. 378, 388 (1989).

*Monell* requires the plaintiffs to identify specific city policies or customs, establish that the policies or customs actually exist, affirmatively link the policies to the city, and establish a causal nexus between plaintiffs' injuries and the city's policies. *Monell* at 694. The plaintiff must also demonstrate that a specific municipal policy was "the moving force" behind the violation of federal rights. *City of Oklahoma v Tuttle*, 471 U.S. 808, 818 (1985). The plaintiffs need to specifically identify the policies and set forth evidence showing that such policies actually existed and were causally related to the alleged violation. In short, the plaintiff must show that the harm was the result of an official policy, custom or practice of the municipality.

A single, constitutional deprivation ordinarily is insufficient to establish a long standing practice or custom. *Christie v Lopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). However, a single constitutional deprivation can be an official policy when: (1) the person causing the violation has "final policy-making authority;" (2) the person causing the violation is a subordinate but his or her action is "ratified" by one with final policy-making authority; or, (3) the person causing the violation is a subordinate but one with final policy-making authority is "deliberately indifferent" to the subordinate's action. *Christie* at 1235-1238. The Supreme Court has held that, for ratification, the final policy-maker must make a deliberate choice from among various alternatives to file a particular cause of action. See *Pembaur v City of Cincinnati*, 475 U.S. 469, 483-84 (1986). "Accordingly, ratification requires, among other things, knowledge of the constitutional violation." *Christie*, supra at 1239.

The plaintiffs in the instant case have no evidence that the City of Oxnard or the Oxnard Police Department maintain any policy that is in any way related to the alleged violation of Mr. Ramirez' or the plaintiffs' constitutional rights. Further, the

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

1   plaintiffs have no evidence to support a finding that the City made a "conscious,

2   affirmative choice" to ratify the alleged unconstitutional conduct in question.   See

3   *Haugen v Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003).   In any case, the defendants

4   have produced evidence that:

5              1.   Oxnard police officers meet or exceed POST training standards;

6              2.   The Oxnard Police Department provides their officers with

7   exceptional, on-going training;

8              3.   The Oxnard Police Department does not have indifferent policies,

9   towards people who need medical care;

10              4.   The Oxnard Police Department does not have policies or practices

11   of condoning excessive force;

12              5.   The Oxnard Police Department does not fail to screen or supervise

13   its officers nor does it fail to investigate citizen complaints against its personnel.   (UF

14   32-36)

15          Plaintiffs' *Monell* claims should be dismissed.

16                       **X.**

17   **CHIEF WILLIAMS IS ENTITLED TO  JUDGMENT AS**

18   **A MATTER OF LAW AS TO ALL CLAIMS AGAINST HER**

19          Chief Williams' liability would only be premised on her job as Chief of Police

20   of the Oxnard Police Department.   To prove a supervisor's liability, the plaintiffs

21   must   show   (1)   the   supervisor's   personal   involvement   in   the   constitutional

22   deprivation, or, (2) a sufficient causal connection between the supervisor's wrongful

23   conduct and the constitutional violation. *Jeffers v Gomez*, 267 F.3d 895, 915 (9th Cir.

24   2001).   Supervisors can be held liable if they played an affirmative part in the alleged

25   deprivation of constitutional rights, like setting in motion a series of acts by others

26   which the supervisor knew or reasonably should have known would cause others to

27   inflict a constitutional injury.   *Graves v City of Coeur d'Alene*, 339 F.3d 828, 848

28   (9th Cir. 2003); *Larez v City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).

1    There is no evidence in the instant case that Chief Williams was present during

2  the instant case involving Mr. Ramirez or that she personally acquiesced in any

3  constitutional deprivation or has shown a callous indifference to the rights of others.

4                                              **XI.**

5                                    <u>**CONCLUSION**</u>

6    For all of the reasons set forth above, defendants respectfully request that the

7  Court grant summary judgment in their favor and against plaintiffs.   Alternatively,

8  defendants request that the Court grant summary adjudication as to the issues and

9  claims specified above.

10

11  DATED:  November 6, 2014          WISOTSKY, PROCTER & SHYER

12

13                                   By: _____
                                         Alan E. Wisotsky
14                                       James N. Procter II
                                         Brian P. Keighron
15                                       Attorneys for Defendants,
                                         CITY OF OXNARD, OXNARD POLICE
16                                       DEPARTMENT, JERI WILLIAMS,
                                         STEVEN RAMIREZ, MICHAEL
17                                       BOCANEGRA, ROSLYNN WILFERT,
                                         PEDRO RODRIGUEZ, AARON ZAVALA,
18                                       KYLE BRANTNER, and MATTHEW ROSS

19

20

21

22

23

24

25

26

27

28

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920