Alan E. Wisotsky – State Bar No. 68051
James N. Procter II – State Bar No. 96589
Brian P. Keighron – State Bar No. 71445
WISOTSKY, PROCTER & SHYER
300 Esplanade Drive, Suite 1500
Oxnard, California 93036
Phone: (805) 278-0920
Facsimile: (805) 278-0289
Email: bkeighron@wps-law.net

Attorneys for Defendants,
  CITY OF OXNARD, OXNARD POLICE
  DEPARTMENT, JERI WILLIAMS, STEVEN
  RAMIREZ, MICHAEL BOCANEGRA,
  ROSLYNN WILFERT, PEDRO RODRIGUEZ,
  AARON ZAVALA, KYLE BRANTNER, and
  MATTHEW ROSS

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUILLERMO RAMIREZ, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>OXNARD POLICE DEPARTMENT, et al.,<br><br>  Defendants. | CASE NO. CV13-01615-MWF-AN<br><br>**DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**<br><br>[Filed concurrently with motion for summary judgment and proposed judgment]<br><br>Pretrial conference: February 2, 2015<br>Trial:   February 24, 2015<br><br>Date:  December 8, 2014<br>Time:  10:00 a.m.<br>Ctrm:  1600<br>Judge: Michael W. Fitzgerald |

Defendants CITY OF OXNARD, OXNARD POLICE DEPARTMENT, JERI WILLIAMS, STEVEN RAMIREZ, MICHAEL BOCANEGRA, ROSLYNN WILFERT, PEDRO RODRIGUEZ, AARON ZAVALA, KYLE BRANTNER, and MATTHEW ROSS hereby submit their statement of uncontroverted facts and conclusions of law in support of their concurrently filed motion for summary judgment.

1

# UNCONTROVERTED FACTS

1. On the evening of June 23, 2012, at 10:40 p.m., Arturo Pedro called Oxnard Police Department 911 regarding a "Robert" who had swallowed an "eight ball of meth" and who was "bouncing off the walls." Mr. Pedro reported that the man needed medical attention but that the dispatcher should "send the police first." The 911 operator dispatched police and fire units to the scene.

[Declaration of Kala Everhart, Exhibit A, p.1:12-15; Reporters Transcript of 911 Call, Exhibit B, p.2:3-5:2]

2. Gold Coast Ambulance and fire personnel arrived at the scene. Pursuant to protocol, the ambulance and fire department staged around the corner, awaiting word from the police that it was safe to enter the scene and render medical treatment.

[Jaime Villa Deposition, Exhibit C, p.14:19-15:10; 80:2-19]

3. Officer Michael Bocanegra was the first officer to arrive at the scene. Officer Bocanegra spoke with a bystander, who told him that Mr. Ramirez swallowed an eight ball of methamphetamine. The bystander, believed to be the reporting party, Mr. Pedro, pointed out Mr. Ramirez, who at that point was in the porch area at 1174 South L Street.

[Declaration of Michael Bocanegra, Exhibit D, p. 1:13-18]

4. Officer Bocanegra approached Mr. Ramirez, who was pacing back and forth on the porch wearing shorts and sneakers and not wearing a shirt. He appeared very agitated and was talking incoherently and continually balling his hands into fists. Because Mr. Ramirez appeared to be "amped up," and under the influence of drugs, Officer Bocanegra withdrew his Taser from his duty belt.

[Bocanegra declaration, Exhibit D, p.1:19-2:4]

5. Officer Bocanegra verbally tried to calm Mr. Ramirez down. Officer Bocanegra talked to Mr. Ramirez and asked him, "What's going on? We're trying to help." Officer Bocanegra had received Crisis Intervention Team (CIT) training and spoke to Mr. Ramirez in a calm voice. Officer Bocanegra also turned on his PUMA

1  recording device and kept it on during the incident.

2  [Bocanegra declaration, Exhibit D, p.2:5-11]

3  6. Officer Kyle Brantner next arrived at the scene. Officer Brantner observed Mr. Ramirez to be very agitated, pacing back and forth, and constantly pointing and flailing his arms. He noticed that Mr. Ramirez appeared to be sweating and his body was shaking. Officer Bocanegra was continually talking to Mr. Ramirez. Because Mr. Ramirez appeared to be extremely under the influence of drugs and acting in an erratic manner, Officer Brantner used his radio to request the assistance of additional officers.

10  [Declaration of Kyle Brantner, Exhibit E, p.1:17-2:1]

11  7. Officer Bocanegra suggested to Officer Brantner that he should put on his latex gloves in the event they had to go "hands on" with Mr. Ramirez. Officer Brantner also took his collapsible baton out of his belt for officer safety in the event that Mr. Ramirez suddenly attacked either the officers or the witnesses who were standing nearby.

16  [Brantner Declaration, Exhibit E, p. 2:2-6]

17  8. The next officer to arrive at the scene was Sgt. Steven Ramirez, who observed Mr. Ramirez to be very agitated and sweating profusely  Sgt. Ramirez also has CIT training. Sgt. Ramirez told Robert Ramirez that he was not in trouble and that the police were only there to get him help and that the ambulance was just down the street. He repeatedly asked Mr. Ramirez to lie down on his stomach so that they could get him medical treatment. He told Mr. Ramirez to relax so they could get him help but that, for everyone's safety, he needed to lie down on his stomach. Mr. Ramirez did not respond to or comply with any of Sgt. Ramirez' requests.

25  [Declaration of Steven Ramirez, Exhibit F, p.1:5-2:22]

26  9. Officers Pedro Rodriguez and Roslynn Wilfert next arrived on the scene. Officer Rodriguez began speaking to Mr. Ramirez in Spanish and asked him in Spanish to lie down on his stomach. Mr. Ramirez did not respond or comply with

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

any of the commands given to him in Spanish by Officer Rodriguez.

[Ramirez Declaration, Exhibit F, p. 2:19-22; Declaration of Pedro Rodriguez, Exhibit G, p. 2:2-6]

10. Officer Matt Ross and Officer Aaron Zavala then arrived on scene. Officer Ross also has CIT training. Mr. Ramriez was still visibly agitated and sweating profusely. Mr. Ramirez was making odd noises . He appeared to be severely under the influence of drugs.

[Declaration of Matt Ross, Exhibit H, p.1:27-28; Declaration of Aaron Zavala, Exhibit I, p.1:13-16]

11. While Mr. Ramirez was seated on the porch step, Sgt. Ramirez informed the other officers of the need to go "hands on" with Mr. Ramirez to enable medical personnel to treat him. Sgt. Ramirez directed Officers Rodriguez and Wilfert to make contact with Mr. Ramirez. Officers Bocanegra and Brantner were to remain in front of Mr. Ramirez in the event Mr. Ramirez attempted to run away.

[Ramirez Declaration, Exhibit F, p. 2:23-3:5]

12. While Mr. Ramirez was sitting on the porch step, Officer Rodriguez put his hand on Mr. Ramirez's left shoulder and left arm in an attempt to put Mr. Ramirez' arm in a control hold. Mr. Ramirez immediately started to rise. Officer Rodriguez said "Calmado" several times to calm Mr. Ramirez down. After Mr. Ramirez stood up, he moved forward and slid out of Officer Rodriguez's grasp.

[Rodriguez Declaration, Exhibit G, p. 2:13-24; Ramirez Declaration Ramirez Exhibit F, p.3:6-12]

13. Officers attempted to grab Mr. Ramirez's arms and legs. Mr. Ramirez struggled with them, moving forward approximately five to seven feet. Mr. Ramirez was then taken to the ground on his stomach with the officers holding on to his body.

[Bocanegra Declaration, Exhibit D, p. 3:3-8; Brantner Declaration, Exhibit E, p.2:15-19; Ramirez Declaration, Exhibit F, p.3:6-10; Rodriguez Declaration,

Exhibit G, p.2:22-27; Ross Declaration, Exhibit H, p.2:8-16; Zavala Declaration, Exhibit I, p.1:18-24; Declaration of Roslynn Wilfert, Exhibit J, p.2:5-16]

14. After Mr. Ramirez was placed on the ground, he violently struggled and yelled and was thrashing his body up and down and kicking his legs. The right side of his face was on the concrete driveway and he was scraping his face and banging his head on the driveway. Officer Zavala put his hand on Mr. Ramirez' head to keep it from banging on the ground.

[Bocanegra Declaration, Exhibit D, p. 3:9-12; 19-22; Brantner Declaration, Exhibit E, p.2:20-26; 3:2-4; Rodriguez Declaration, Exhibit G, p.3:-4; Zavala Declaration, Exhibit I, p.2:14-16;19-21]

15. Officer Ross knelt on Mr. Ramirez's right leg and used both of his hands to keep his right leg from kicking. Officer Rodriguez straddled Mr. Ramirez's left leg to prevent his left leg from kicking.

[Ross declaration, Exhibit H, p. 2:17-21; Rodriguez declaration, Exhibit G, p. 3:1-4]

16. The officers tried to get Mr. Ramirez' arms behind his back to handcuff him. Mr. Ramirez continuously resisted being handcuffed. Officer Zavala put his weight on Mr. Ramirez' right shoulder for about 20 seconds to keep his right arm from flailing. Sgt. Ramirez took hold of Mr. Ramirez' right arm and put it behind Mr. Ramirez' back. Officer Rodriguez handcuffed the right hand.

[Bocanegra Declaration, Exhibit D, p. 3:19-22; Ramirez Declaration, Exhibit F, p. 3:17-28; Rodriguez Declaration, Exhibit G, p.3:5-11; Zavala Declaration, Exhibit I, p.2:2-10]

17. Officer Rodriguez handed the handcuff to Officer Wilfert, who initially put her right knee on the center low back area of Mr. Ramirez' back. She had her knee in that position for approximately 20 seconds.

[Rodriguez Declaration, Exhibit G, p.3:10-11; Wilfert Declaration, Exhibit J, p. 2:19-22]

5

18. Mr. Ramirez arched his back up and began pushing up and trying to get off the ground. Officer Wilfert repositioned her right knee towards his center back in an effort to keep him on the ground. She took her right knee off Mr. Ramirez' back before his left hand was handcuffed. Her right knee was on Mr. Ramirez' back for a total time of less than one minute.

[Wilfert Declaration, Exhibit J, p.2:23-27]

19. Mr. Ramirez' left hand was underneath his body. Officer Brantner was kneeling on the ground to the left side of Mr. Ramirez' body and tried to pull his left hand out from underneath his body but was unable to do so. Officer Zavala, who was on Mr. Ramirez' right side, put his hand underneath Mr. Ramirez' body to push Mr. Ramirez' left hand towards Officer Brantner.

[Bocanegra Declaration, Exhibit D, p. 3:23-25; Brantner Declaration, Exhibit E, p. 2:20-26; Ramirez Declaration, Exhibit F, p.3:20-22; Ross Declaration, Exhibit H, p.2:22-25; Zavala Declaration, Exhibit I, p.2:7-13]

20. Because Mr. Ramirez' arm was not coming out, Officer Brantner put his baton in the crook of Mr. Ramirez' left elbow to "pry" his arm out. This proved successful and the officers were able to get his right arm behind Mr. Ramirez' back and handcuff it. Mr. Ramirez continued yelling during this process. The entire handcuffing process for both hands took about a minute and thirty seconds.

[Bocanegra Declaration, Exhibit D, p. 3:23-25; Brantner Declaration, Exhibit E, p. 2:23-3:6; Ramirez Declaration, Exhibit F, p. 4:1-7; Rodriguez Declaration, Exhibit G, p. 3:10-17; Ross Declaration, Exhibit H, p.2:22-3:3; Zavala Declaration, Exhibit I, p.2:17-26]

21. Officer Bocanegra crouched near Mr. Ramirez's left shoulder and held his Taser against Mr. Ramirez's shoulder in a drive-stun mode in the event Mr. Ramirez was able to get up. Officer Bocanegra never activated his Taser during the incident nor did he put any weight on Mr. Ramirez' body.

[Bocanegra declaration, Exhibit D, p. 3:13-17; 4:10-13]

22. After Mr. Ramirez's hands were handcuffed, he continued to wildly kick his legs and feet. Officer Wilfert had a nylon hobble device in her pocket. Officer Ross and Officer Wilfert applied the hobble device in the area of Mr. Ramirez' ankles to stop him from kicking his feet.

[Bocanegra Declaration, Exhibit D, p. 3:26; Brantner Declaration, Exhibit E, p. 3:6-9; Ross Declaration, Exhibit H, p. 3:4-8; Wilfert Declaration, Exhibit J, p. 3:1-6]

23. During the process of hobbling Mr. Ramirez' legs together, Officer Rodriguez, who had been straddling Mr. Ramirez' left leg, got his right leg caught between Mr. Ramirez' legs. Officer Rodriguez' leg was being squeezed by Mr. Ramirez' legs. It took about 20 seconds for Officer Rodriguez to extract his legs from between Mr. Ramirez' legs.

[Rodriguez Declaration, Exhibit G, p. 3:18-22]

24. Mr. Ramirez continued to struggle even after being handcuffed and his feet being hobbled together. Officer Ross suggested that a body wrap system be used and Sgt. Ramirez directed an officer to retrieve a body wrap system from a patrol unit.

[Ramirez Declaration, Exhibit F, p. 4:13-16; Ross Declaration, Exhibit H, p. 3:9-12]

25. About 30 seconds after the hobble had been placed, an officer stated that Mr. Ramirez appeared to not be breathing. Officer Wilfert and Sgt. Ramirez felt for a pulse and believed they felt a pulse. Officer Zavala and Sgt. Ramirez immediately turned Mr. Ramirez onto his right side. Sgt. Ramirez and Officer Rodriguez saw Mr. Ramirez appear to take a breath. Fire and ambulance personnel were immediately summoned to the scene by Sgt. Burr. Officer Wilfert began a sternum rub. Officer Bocanegra ran to get a CPR mask out of his vehicle.

[Bocanegra Declaration, Exhibit D, p.4:1-6; Brantner Declaration, Exhibit E, p. 3:10-15; Ramirez Declaration, Exhibit F, p. 4:23-5:3; Rodriguez

7

Declaration, Exhibit G, p. 3:23-4:1; Ross Declaration, Exhibit H, p.3:12-16; Zavala Declaration I, p. 3:3-8; Wilfert Declaration, Exhibit J, p. 3:11-18]

26. Fire and ambulance personnel, including Paramedic Jaime Villa, arrived at the scene. They requested that the handcuffs be removed. The handcuffs were removed within 30 to 60 seconds. Fire and ambulance treated Mr. Ramirez. His heart had pulseless electrical activity and he was not breathing.

[Villa Deposition, Exhibit C, p. 12;3-14; 36:12- 37:10; 68:8-69:10]

27. Mr. Ramirez was transported to the hospital. He is pronounced dead at the hospital. His body temperature at the hospital was 105.6 degrees.

[Villa Deposition, Exhibit C, p. 46:24-47:14; Deposition of Ronald O'Halloran, M.D., Exhibit K, p. 50:25-52:2]

28. An autopsy was conducted by Ventura County Medical Examiner Ronald O'Halloran, M.D. A plastic baggie containing methamphetamine and a plastic baggie containing marijuana were found in Mr. Ramirez' stomach.

[O'Halloran Deposition, Exhibit K, p. 53:22-54:17; 56:13-57:5]

29. The amount of methamphetamine found in Mr. Ramirez' blood and from the autopsy were consistent with his having swallowed an "eight-ball" of methamphetamine. His methamphetamine blood level was 8.185Ng/ml at the hospital and approximately 10,075 Ng/ml at autopsy. The methamphetamine level in his stomach was 3,145,000 Ng/ml. The methamphetamine level was very high.

[O'Halloran Deposition, Exhibit K, p. 51:710 53:4-14; 131:5-132:15]

30. Mr. Ramirez' body temperature at the hospital was 105.6 degrees. Anything over 105 degrees is considered critical.

[O'Halloran Deposition, Exhibit K, p. 51:14-52:2]

31. EMTs could not have done anything at the scene to alleviate the potential for Mr. Ramirez to die from the overdose of methamphetamine.

[O'Halloran Deposition, Exhibit K, p. 55:14-56:4]

///

32. Oxnard Police Department officers meet or exceed the training standards of POST (Commission on Police Officer Standards and Training) and the Oxnard Police Department provides its officers with exceptional ongoing training.

[Declaration of Curtis J. Cope, Exhibit L, p.13, ¶(h)]

33. The Oxnard Police Department does not have any policy, practice or procedure of indifference to any person who might need medical care.

[Cope Declaration, Exhibit L, p.14, ¶ (h)]

34. The Oxnard Police Department does not have any policy, custom or practice of condoning officers use of excessive force against citizens.

[Cope Declaration, Exhibit L, p.14, ¶(h)]

35. The Oxnard Police Department has no policy, practice or procedure of failing to supervise the employees of the Oxnard Police Department or failing to screen qualified persons for the position of police office within the City of Oxnard.

[Cope Declaration, Exhibit L, p.14, ¶(h)]

36. There is no evidence that the Oxnard Police Department fails to investigate citizen's complaints against their personnel.

[Cope Declaration, Exhibit L, p.14, ¶(h)]

## CONCLUSIONS OF LAW

1. The individual defendants' conduct and use of force was reasonable and did not violate the decedent's and the plaintiffs' constitutional rights. *Graham v Connor*, 490. U.S. 386 (19809); *Tennessee v Garner*, 471 U.S. 1 (1985); *Motley v Parks*, 432 F.3d 1072, 1088 (9th Cir. 2005).

2. The individual defendants are entitled to qualified immunity because their conduct did not violate clearly established constitutional rights. *Harlow v Fitzgerald*, 457 U.S. 800, 818 (1982).

3. The City of Oxnard, the Oxnard Police Department and Chief Jeri Williams are entitled to judgment as a matter of law as to the third, fourth, eighth and ninth claims for relief for Monell violations under 42 U.S.C. §1983. *Monell v New*

*York Dept. of Social Services*, 436 U.S. 658, 694 (1978).

4. Chief Williams and the Oxnard Police Department are entitled to judgment as a matter of law as to the third, fourth, eighth and ninth claims for relief for civil rights violations under 42 U.S.C. §1983. *Jeffers v Gomez*, 267 F.3d 895, 915 (9th Cir. 2001); *Board of County Commissioners of Bryan County, Oklahoma v Brown*, 520 U.S. 397, 412-413 (1997); *City of Canton v Harris*, 49 U.S. 378, 390 (1989).

5. The defendants are entitled to judgment as a matter of law on the fourth and fifth claims for relief for assault and battery because police officers may use such force as is necessary to defend themselves and others and the force used in this case was reasonable. *Long Beach Police Officers Assoc. v City of Long Beach*, 61 Cal.App.3d 364, 368-369 (1976).

6. The defendants are entitled to judgment as a matter of law as to the tenth cause of action for wrongful death and negligence because the force used by the officers was reasonable and there was no breach of any duty that they may have to plaintiff.

7. Defendants are entitled to judgment as a matter of law on the first, second, third, fourth, seventh, eighth and ninth causes of action because there was no underlying constitutional violation. *Graham v Connor*, 490. U.S. 386 (19809); *Tennessee v Garner*, 471 U.S. 1 (1985); *Motley v Parks*, 432 F.3d 1072, 1088 (9th Cir. 2005).

8. Defendants are entitled to judgment as a matter of law as to the seventh and eighth claims for relief because the Fourteenth Amendment's substantive due process clause can only be violated when the conduct was arbitrary, conscious shocking or violative of the "decencies of civilized conduct." Defendants' conduct did not reach such level of culpability. *County of Sacramento v Lewis*, 523 U.S. 833, 845-847; *Moreland v Las Vegas Metropolitan Police Depart.*, 159 F.3d 365, 371, n.4 (9th Cir. 1998).

10

9. Judgment should be entered in favor of defendants CITY OF OXNARD, OXNARD POLICE DEPARTMENT, JERI WILLIAMS, STEVEN RAMIREZ, MICHAEL BOCANEGRA, ROSLYNN WILFERT, PEDRO RODRIGUEZ, AARON ZAVALA, KYLE BRANTNER, and MATTHEW ROSS and against plaintiffs GUILLERMO RAMIREZ, an individual and successor-in-interest to ROBERT RAMIREZ, deceased; TERESA RAMIREZ, an individual and successor-in-interest to ROBERT RAMIREZ, deceased; R.R. [name redacted], a minor and successor-in-interest to ROBERT RAMIREZ, deceased, by and through his Guardian Ad Litem, Antonio Anguiano Cervantez.

DATED: November 6, 2014                    WISOTSKY, PROCTER & SHYER

By: _____
Alan E. Wisotsky
James N. Procter II
Brian P. Keighron
Attorneys for Defendants,
CITY OF OXNARD, OXNARD POLICE DEPARTMENT, JERI WILLIAMS, STEVEN RAMIREZ, MICHAEL BOCANEGRA, ROSLYNN WILFERT, PEDRO RODRIGUEZ, AARON ZAVALA, KYLE BRANTNER, and MATTHEW ROSS

Defendants' Statement of Uncontroverted Facts and Conclusions of Law in support of motion for summary judgment received/reviewed.

Dated:_____              _____
                                 Michael W. Fitzgerald
                                 United States District Judge