1  Alan E. Wisotsky – State Bar No. 68051
   James N. Procter II – State Bar No. 96589
2  Brian P. Keighron – State Bar No. 71445
   WISOTSKY, PROCTER & SHYER
3  300 Esplanade Drive, Suite 1500
   Oxnard, California 93036
4  Phone: (805) 278-0920
   Facsimile: (805) 278-0289
5  Email: bkeighron@wps-law.net

6  Attorneys for Defendants,
       CITY OF OXNARD, OXNARD POLICE
7      DEPARTMENT, JERI WILLIAMS, STEVEN
       RAMIREZ, MICHAEL BOCANEGRA,
8      ROSLYNN WILFERT, PEDRO RODRIGUEZ,
       AARON ZAVALA, KYLE BRANTNER, and
9      MATTHEW ROSS

10                 **UNITED STATES DISTRICT COURT**

11                 **CENTRAL DISTRICT OF CALIFORNIA**

12

13 | GUILLERMO RAMIREZ, et al.,        | CASE NO. CV13-01615-MWF-AN
14 |         Plaintiffs,                | **DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION**
15 |    v.                              |
16 | OXNARD POLICE DEPARTMENT, et al.,  |
17 |                                    |
18 |         Defendants.                | [Filed concurrently with defendants' objections to plaintiffs' evidence and response to plaintiffs' statement of genuine disputes]
19 |                                    |
20 |                                    | Date : December 8, 2014
21 |                                    | Time : 10:00 a.m.
   |                                    | Ctrm : 1600
22 |                                    | Judge: Michael W. Fitzgerald

23

24    Defendants CITY OF OXNARD, OXNARD POLICE DEPARTMENT, JERI
25 WILLIAMS, STEVEN RAMIREZ, MICHAEL BOCANEGRA, ROSLYNN
26 WILFERT, PEDRO RODRIGUEZ, AARON ZAVALA, KYLE BRANTNER, and
27 MATTHEW ROSS respectfully submit their reply to plaintiffs' opposition to
28 defendants' Motion for Summary Judgment, or, in the Alternative, Motion for

                                       1

Summary Adjudication.

DATED: November 24, 2014                WISOTSKY, PROCTER & SHYER


                                        By: _____
                                            Alan E. Wisotsky
                                            James N. Procter II
                                            Brian P. Keighron
                                            Attorneys for Defendants,
                                            CITY OF OXNARD, OXNARD POLICE
                                            DEPARTMENT, JERI WILLIAMS,
                                            STEVEN RAMIREZ, MICHAEL
                                            BOCANEGRA, ROSLYNN WILFERT,
                                            PEDRO RODRIGUEZ, AARON ZAVALA,
                                            KYLE BRANTNER, and MATTHEW ROSS

# TABLE OF CONTENTS

**PAGE**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Memorandum of Points and Authorities

I. MUCH OF THE EVIDENCE SUBMITTED BY . . . . . . . . . . . . . . . . . . 5
PLAINTIFFS IN OPPOSITION TO THE DEFENDANTS
MOTION CONSISTS OF INADMISSIBLE AND
UNRELIABLE HEARSAY AND EXHIBITS WHICH
LACK EVIDENTIARY FOUNDATION

II. EVEN IF, AS ALLEGED BY PLAINTIFFS, THE . . . . . . . . . . . . . . . 6
CAUSE OF MR. RAMIREZ' DEATH WAS
RESTRAINT ASPHYXIA, THAT FACT ALONE
IS INSUFFICIENT TO ESTABLISH THAT THE
POLICE OFFICERS' CONDUCT WAS OBJECTIVELY
UNREASONABLE

III. PLAINTIFFS OFFER NO EVIDENCE TO SUPPORT . . . . . . . . . . . . 12
THEIR CONTENTION THAT DEFENDANTS
VIOLATED PLAINTIFFS' SUBSTANTIVE DUE
PROCESS CLAIMS

IV. PLAINTIFFS' *MONELL* CLAIMS SHOULD . . . . . . . . . . . . . . . . . 12
BE DISMISSED

V. PLAINTIFFS HAVE PRODUCED NO EVIDENCE . . . . . . . . . . . . . . 13
TO SUPPORT A CASE OF LIABILITY
AGAINST CHIEF WILLIAMS

VI. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# TABLE OF AUTHORITIES

**PAGE**

**FEDERAL CASES**

*Bornstead v Honey Brook Township*
   211 Fed. Appex. 118 (3rd Cir. 2007) .................................... 6, 7, 10

*City of Oklahoma v Tuttle*
   471 U.S. 808, 818 (1985) ........................................................... 13

*Drummond v City of Anaheim*
   343 F.3d 1052 (9th Cir. 2003) .............................................. 7, 10, 11

*Estate of Phillips v City of Milwaukee*
   123 F.3d 586 (7th Cir. 1997) ............................................. 7, 8, 9, 10

*Graham v Connor*
   490 U.S. 396 (1989) ..................................................................... 7

*Monell v New York Dept. of Social Services*
   146 U.S. 658 (1978) .............................................................. 12, 13

*Starr v Baca*
   652 F.3d 1202 (9th Cir. 2011) ...................................................... 13

**STATUTES:**

28 U.S.C. §1983 ................................................................................ 8, 13

# I.

## MUCH OF THE EVIDENCE SUBMITTED BY PLAINTIFFS IN OPPOSITION TO THE DEFENDANTS' MOTION CONSISTS OF INADMISSIBLE AND UNRELIABALE HEARSAY AND EXHIBITS WHICH LACK EVIDENTIARY FOUNDATION

As set forth in detail in defendants' Objections to Plaintiff's Evidence in Opposition to Defendants' Motion for Summary Judgment, much of the evidence submitted by plaintiffs consists of inadmissible and inherently unreliable hearsay and double hearsay (in the form of investigator's summaries of witness statements) and other documents, including opinions, which lack sufficient evidentiary foundation. Said inadmissible evidence includes the following:

1. Plaintiffs' Exhibit A, an unauthenticated transcription of the 911 call;

2. Plaintiffs' Exhibit H, investigator's summary of interview with Winfred Kerford;

3. Plaintiffs' Exhibit I, investigator's summary of interview with Arturo Pedro;

4. Plaintiffs' Exhibit O, investigator's summary of interview with Maria and Salvador Santoyo;

5. Plaintiffs' Exhibit P, investigator's summary of interview with Erika Pedro;

6. Plaintiffs' Exhibit Q, summary of investigation by deputy medical examiner, James Baroni; and,

7. Plaintiffs' Exhibit V, opinion letter written by Robert O'Halloran, M.D.

Even though, for the most part, these various items of evidence essentially corroborate the police officers' version of the incident, the plaintiffs should not be permitted to rely upon evidentiary exhibits which are clearly inadmissible, unauthenticated and inherently unreliable.

Defendants' respectfully request that the Court strike and not consider said

evidence when ruling on defendants' motion.

## II.

## EVEN IF, AS ALLEGED BY PLAINTIFFS, THE CAUSE OF MR. RAMIREZ' DEATH WAS RESTRAINT ASPHYXIA, THAT FACT ALONE IS INSUFFICIENT TO ESTABLISH THAT THE POLICE OFFICERS' CONDUCT WAS OBJECTIVELY UNREASONABLE

A review of defendants' response to plaintiffs' Statement of Genuine Disputes reveals that virtually all of the material facts of this case, except for some minor discrepancies, are essentially undisputed. However, to avoid summary judgment, plaintiffs seek to rely primarily on Ronald O'Halloran, M.D.'s opinion that Mr. Ramirez died from restraint asphyxia. It should be noted that defendants will present expert evidence at trial that will clearly establish that Mr. Ramirez died at the scene from severe methamphetamine intoxication resulting in sudden cardiac death. However, even if the Court, for purposes of ruling on defendants' motion for summary judgment, views the evidence most favorably to the plaintiffs as to the cause of death issue, Dr. O'Halloran's opinion in no way establishes that defendants acted in an objectively unreasonable manner, any more than the fact that a subject was shot by a police officer establishes that the officer's action was objectively unreasonable.

Federal courts have often held that police officers had acted in an objectively reasonable manner even where the cause of death was labeled as asphyxia. For example, in *Bornstead v Honey Brook Township*, 211 Fed. Appx. 118 (3rd Cir. 2007), the intoxicated subject refused to submit to the officers' request that he put his hands behind his back so they could handcuff him. He swung at the officers and was wrestled to the ground. The officers used pepper spray, but to no effect. On the ground, he continued to thrash and flail and was not compliant even after he had been handcuffed. When backup officers arrived, they attempted to hold Mr. Bornstead

down and tied his feet together. While attempting to load him into a police vehicle, one of the officers noticed that he was not breathing. He was then transported by ambulance to a hospital where he was pronounced dead. An autopsy listed the cause of death as compression asphyxia.

Despite the coroner's conclusion as to the cause of death, the district court found that the officers had acted reasonably in attempting to subdue Bornstead and there was no evidence that the officers used any force after he stopped resisting. *Bornstead* supra at 120-122. The Court of Appeals affirmed the district court's opinion with respect to the excessive force claim.

Evaluating the totality of the circumstances as required by *Graham v Connor*, 490 U.S. 396 (1989), the court found that the officers were confronted with an uncooperative, intoxicated and physically imposing individual and that the district court properly considered the scene from the perspective of an officer responding to the dispatch to Bornstead's home. The court found that "the officers' actions, although they had fatal consequences, were objectively reasonable." *Bornstead* at 122-124. Distinguishing the *Bornstead* case from *Drummond v City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), the court found that it was not so clearly unreasonable to exert even severe force on an individual who continues to violently resist, noting that Mr. Bornstead continued to struggle with the police even after he had been down on the ground and handcuffed. Given the resistance that Bornstead mounted during his arrest, the Third Circuit found it impossible to compare the circumstances of his arrest with those in *Drummond*. Furthermore, neither the decision to roll Bornstead over onto his stomach and handcuff him behind his back or the decision to bind his legs constituted objectively unreasonable force because the struggle had escalated to the point where such restraints were appropriate. *Bornstead* supra at 125.

In *Estate of Phillips v City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997), the survivor of an arrestee who stopped breathing and died after police officers placed him in a prone position on the floor while handcuffed brought a §1983 action alleging

7

that the officers used excessive force in seizing the arrestee. The district court granted summary judgment and the Seventh Circuit Court of Appeals affirmed finding that the officers did not use excessive force. In *Phillips*, the officers were informed that Mr. Phillips had been behaving strangely the past few days and proceeded to the third floor of a hotel where they encountered a security guard who reiterated that Mr. Phillips was behaving in a bizarre fashion. Mr. Phillips was wearing a trench coat, no shirt and trousers that were about to fall down. He was visibly shaking and sweating. The officers asked Mr. Phillips what his name was and what was going on but Mr. Phillips responded only with unintelligible sounds. At that point, one of the hotel employees told the officers to be careful because Mr. Phillips had a ballpoint pen clutched in each hand. The officers feared for their safety and grabbed Mr. Phillips wrists. Mr. Phillips resisted and a struggle ensured. *Estate of Phillips* at 588.

Similar to the circumstances of the instant case, the struggle between Mr. Phillips and the police, though intense, was not marked by any violent behavior on the part of the police. Mr. Phillips struggled to break free of the officers' grasps and the officers could not pry Mr. Phillips' fingers apart so the pens remained in his hand. As a result, it was decided that he should be placed on the bed to control him to avoid anyone being injured. The officers were not shouting or being abusive and in fact they were telling Mr. Phillips that everything would be fine and that they were just going to take him out of the hotel. *Id.* at 588-589.

Despite the fact that the officers were trying to help Mr. Phillips, he became violent when the officers tried to move him over to the bed. He began thrashing his arms and pulling with his shoulders and upper body. As a result, the officers decided to place Mr. Phillips on the floor instead and, with the aid of hotel personnel, they succeeded in bringing the struggling Mr. Phillips to the floor. Once there, Mr. Phillips became more violent, kicked his feet and even tried to bite one of the officers. The officers eventually managed to place handcuffs on each of Mr. Phillips'

wrists. *Id.* at 588-589.

Mr. Phillips continued to struggle and kick violently on the floor after being handcuffed. One of the officers placed her knee on Mr. Phillips' right shoulder blade to hold him down and to keep him from turning over. The female officer estimated that she had her knee on Mr. Phillips back for about one minute.

Other officers arrived and placed leg restraints on Mr. Phillips ankles because his legs were still moving. The leg restraints were applied about a minute or so after the handcuffs. After a few minutes, Mr. Phillips began to calm down. However, after rolling Mr. Phillips over and checking his pulse, it was determined by the officers that Mr. Phillips had stopped breathing. Paramedics responded and determined that Mr. Phillips was a pulseless non-breather. He was taken to a hospital where he died the next day. The doctor who performed the autopsy indicated that Mr. Phillips was an obese individual and opined that when an obese individual is placed on the floor in a prone position, his ability to breathe is inhibited. He also opined that placing Mr. Phillips in a prone position with his hands behind his back may have been a contributing factor to his death. *Id.* at 590.

The Seventh Circuit, in reviewing the facts of the case, determined that the officers actions were objectively reasonable. The court found that the officers acted appropriately in grabbing Mr. Phillips and, although the struggle escalated from that point, it was Mr. Phillips' actions that caused the escalation, in that he thrashed around violently when his wrists were grabbed and refused to unclench his fists to drop the pens. The officers attempted to soothe him with words and to take him over the bed but had little success. They then understandably decided to take Mr. Phillips to the floor, which required that his legs be taken out from under him. The court further found that once on the ground, Mr. Phillips continued to struggle and tried to roll over and kick. The court found that the officers' response, in trying to handcuff him and restrain his legs together, was reasonable. It was reasonable to restrain Mr. Phillips' legs given the peril posed by his continued kicking.

Testimony as to the timing of these events varied somewhat but the court determined that the time differences were immaterial. *Phillips* at 593.

The court found that it was undisputed that just a few minutes passed between Mr. Phillips' wrists being cuffed and his legs being restrained and, at any rate, Mr. Phillips was still moving at the time the leg restraints was applied. The court decided that placing a person in a prone position while handcuffed on the floor does not, in and of itself, violate the Fourth Amendment. Although the plaintiffs alleged that the officers failed to take reasonable steps to monitor Mr. Phillips, the evidence was clear that Mr. Phillips was on the ground for only a few minutes until the ambulance arrived and that the officers stayed by Mr. Phillips for those few minutes. In summary, the court found that the officers' actions did not violate any of Mr. Phillips' constitutional rights.

The facts and circumstances of the instant case are very similar to those faced by the officers in *Bornstead* and *Phillips*. This is not a case like that presented to the Ninth Circuit in *Drummond*. It bears repeating that the facts of this case are clearly distinguishable from the *Drummond* case.

1. Unlike the police in *Drummond*, the officers here did not immediately use force upon encountering Mr. Ramirez, but, rather, first attempted to verbally coax him to getting on the ground so that he could be medically treated.

2. Unlike the police in *Drummond*, the officers here were trying to get Mr. Ramirez medical assistance, but had reasonable cause to believe that Mr. Ramirez posed a physical threat to them and the EMS responders because he was acting in a very agitated and psychotic manner and his size and build (5'10", 205 pounds) posed a threat if he decided to charge at the officers;

3. Unlike the plaintiff in the *Drummond* case, Mr. Ramirez resisted the officers throughout the encounter;

4. Unlike the police in *Drummond*, the officers in this case ceased using force once Mr. Ramirez stopped resisting;

5. The police in *Drummond* continued to keep their weight on Mr. Drummond's back and neck for 20 minutes until another officer arrived; in the instant case, Mr. Ramirez was on the ground for less than four minutes before medical personnel was summoned;

6. In *Drummond*, although Mr. Drummond offered no resistance, an officer placed his knees on Mr. Drummond's back and another officer placed his knee on Mr. Drummond's neck and back despite Mr. Drummond complaining repeatedly that he could not breathe and that the officers were choking him; in the instant case, a female officer had her right knee on Mr. Ramirez' back for less than a minute;

7. In *Drummond*, the court found that once Mr. Drummond was on the ground and not resisting the officers, there was little or no need to use further physical force; in the instant case, after Mr. Ramirez was brought to the ground, he continually resisted the officers' efforts to restrain him and once he stopped resisting, the officers ceased any use of force.

The other Ninth Circuit cases cited by plaintiffs have no factual similarities to the instant case.

It should be noted that the plaintiffs misleadingly assert that "Robert expressed seven times" that he could not breathe. There is absolutely no evidence that Mr. Ramirez expressed that he could not breathe seven times. Even if the Court reviews Mr. Baroni's report, it is indicated in there that on two occasions, approximately 30 – 40 seconds after he is on the ground, Mr. Ramirez made sounds to the effect that he could not breathe. However, thereafter Mr. Ramirez continues to yell, scream and make noises which indicates that he is in fact breathing during the struggle. Plaintiffs' assertion that Mr. Ramirez expressed that he could not breathe seven times is patently untrue.

In sum, the mere fact that the medical examiner opined that Mr. Ramirez died from restraint asphyxia is inadequate to raise a genuine issue regarding whether the officers' conduct was objectively unreasonable. The autopsy report does not set forth

the factual basis for Dr. O'Halloran's opinions. In any case, the mere fact that a medical examiner may disagree with an officer's actions does not render those actions unreasonable and therefore is insufficient to serve as a basis for denying defendants' motion for summary judgment. In addition, the plaintiffs' evidence does not create a material dispute to deny defendants' summary judgment on the negligence and assault and battery state claims.

## III.

## PLAINTIFFS OFFER NO EVIDENCE TO SUPPORT THEIR CONTENTION THAT DEFENDANTS VIOLATED PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIMS

Plaintiffs offer no evidence or case law which would indicate or even imply that the officers' conduct in this case "shocks the conscious" or that they were "deliberately indifferent." Indeed, they agree that an officer's conduct in an escalating situation can only be found to shock the conscious if they act with a purpose of harm unrelated to legitimate law enforcement objectives. There is no evidence in this case that the officers conducted themselves in any manner other than lawfully attempting to restrain Mr. Ramirez so that he could get medical aid. Plaintiffs' substantive due process claims should be dismissed.

## IV.

## PLAINTIFFS' MONELL CLAIMS SHOULD BE DISMISSED

The plaintiffs admit that it is undisputed that:

1. The Oxnard Police Department does not have any policy, practice or procedure of indifference to a person who might need medical care (UF No. 33);

2. The Oxnard Police Department does not have any policy, custom or practice of condoning officers' use of excessive force against citizens (UF No. 34);

3. The Oxnard Police Department does not have a policy, practice or procedure of failing to supervise the employees of the Oxnard Police Department or failing to screen qualified persons for the position of police officer with the City of

Oxnard (UF No. 35).

Further, the plaintiffs did not produce sufficient evidence to dispute defendants' contentions that the Oxnard Police Department officers meet or exceed POST standards or that the Oxnard Police Department provides its officers with exceptional ongoing training (UF #32) and that there is no evidence that the Oxnard Police Department fails to investigation citizen complaints against their personnel (UF No. 36).

In that *Monell v New York Dept. of Social Services*, 146 U.S. 658, 694 (1978), requires a plaintiff to identify specific city policies or customs, then establish that the customs or policies actually exist, and then affirmatively link the policies to the city, and then establish a causal nexus between plaintiffs' injuries and the city's policies, and also must demonstrate that a specific municipal policy was a "moving force" behind the violation of a the civil rights (*City of Oklahoma v Tuttle*, 471 U.S. 808, 818 (1985), the plaintiffs have presented no evidentiary justification to deny defendants' motion for summary judgment on the *Monell* claim.

## V.
## **PLAINTIFFS HAVE PRODUCED NO EVIDENCE TO SUPPORT A CASE OF LIABILITY AGAINST CHIEF WILLIAMS**

The plaintiffs cite *Starr v Baca*, 652 F.3d 1202 (9th Cir. 2011) for the proposition that a police chief can be held liable as a supervisor under §1983 if there exists either (1) his or her personal involvement in the constitutional violation, or, (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Id.* at 1217-1218. In the instant case, the plaintiffs provide no evidence to prove that Chief Williams was personally involved in the alleged constitutional deprivation or any wrongful conduct by Chief Williams which created a causal connection between said alleged conduct and the constitutional violation. The plaintiffs' claims against Chief Williams should be dismissed.

///

13

# VI.
# CONCLUSION

The plaintiffs' evidence comes far short of establishing that the defendants' violated Mr. Ramirez' constitutional rights or establishing any basis for liability in this case. Defendants respectfully request that the Court grant summary judgment in their favor.

DATED: November 24, 2014          WISOTSKY, PROCTER & SHYER

By: /s/ Alan E. Wisotsky
Alan E. Wisotsky
James N. Procter II
Brian P. Keighron
Attorneys for Defendants,
CITY OF OXNARD, OXNARD POLICE DEPARTMENT, JERI WILLIAMS, STEVEN RAMIREZ, MICHAEL BOCANEGRA, ROSLYNN WILFERT, PEDRO RODRIGUEZ, AARON ZAVALA, KYLE BRANTNER, and MATTHEW ROSS

14