1
2
3
4
5
6
7

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUILLERMO RAMIREZ, et al.,      ) | Case No.  CV 13-1615 MWF (ANx) |
|                     ) | |
|              Plaintiffs,   ) | **ORDER DENYING IN PART AND** |
|       v.                 ) | **GRANTING IN PART SUMMARY** |
|                     ) | **JUDGMENT [52]** |
| OXNARD POLICE DEPARTMENT,  ) | |
| et al.,                    ) | |
|                     ) | |
|           Defendants.  ) | |

        Before the Court is the Motion for Summary Judgment or, in the Alternative, Summary Adjudication (the "Motion") filed by Defendants Oxnard Police Department, City of Oxnard, Chief Jeri Williams, Steven Ramirez, Michael Bocanegra, Roslynn Wilfert, Pedro Rodriguez, Aaron Zavala, Kyle Brantner and Matthew Ross on November 6, 2014.  (Docket No. 52).  Plaintiffs filed an Opposition to Motion for Summary Judgment, or in the Alternative, Summary Adjudication (the "Opposition") on November 14, 2014.  (Docket No. 58).  Defendants filed a Reply to Plaintiff's Opposition (the "Reply") on November 24, 2014.  (Docket No. 61).  The Court read and considered the papers filed on the matter and held a hearing on December 8, 2014.

The Court holds that Defendants fail to establish that Steven Ramirez, Michael Bocanegra, Roslyn Wilfert, Pedro Rodriguez, Aaron Zavala, Kyle Brantner and Matthew Ross (the "Officer Defendants") acted reasonably as a matter of law in regard to the decedent, Robert Ramirez.  (Because one of the defendants, Steven Ramirez, shares a last name with the decedent, Robert Ramirez, the Court will refer to the decedent as "Ramirez" and Defendant Steven Ramirez as "Sgt. Ramirez.")  Therefore, the Court **DENIES** Defendants' Motion as to Plaintiffs' first, second, fifth, sixth and tenth claims. Defendants also fail to establish, as a matter of law, the Officer Defendants were not deliberately indifferent to Plaintiffs' Fourteenth Amendment Rights.  The Court therefore **DENIES** Defendants' Motion as to Plaintiffs' seventh claim for relief.  However, the Court **GRANTS** the Motion as to Plaintiffs' claims against the Oxnard Police Department, the City of Oxnard and Chief Jeri Williams.

I.     **BACKGROUND**

This action arises from a tragic encounter between Robert Ramirez and a number of members of the Oxnard Police Department who constitute most of the individual defendants.  The encounter was started by a 911 call by Arturo Pedro that Ramirez had apparently swallowed an "eight ball of meth" and needed medical attention.  (Defendants' Statement of Uncontroverted Facts and Conclusions of Law ¶ 1 ("DSUF") (Docket No. 54-1)).

The 911 operator inquired whether Ramirez would cooperate with the fire department or whether the police were needed.  Pedro said that the police should also be called.  (Defendants' Evidence Submitted in Support of Motion for Summary Judgment, Exhibit B at 5 (Docket No. 53-2)).

An ambulance and fire personnel arrived first, but waited around a corner before they received word from the police that it was safe to approach Ramirez.  (DSUF ¶ 2). Defendant Officer Bocanegra was the first police officer to arrive at the scene.  (DSUF ¶ 3).  Ramirez was "amped up," very agitated, pacing back and forth and constantly flailing his arms and balling his hands into fists.  (DSUF ¶¶ 3, 6).  Bocanegra attempted to

talk to Ramirez and calm him down but also withdrew his Taser.  (DSUF ¶¶ 4, 5).
Defendant Officer Brantner arrived next and after observing Ramirez's state called on his
radio for more assistance.  (DSUF ¶ 6).  Defendant Sgt. Ramirez arrived next and told
Ramirez that they were there to assist him, that an ambulance was down the street, and
requested that Ramirez lie down on his stomach.  (DSUF ¶ 8).  Officer Defendants
Rodriguez, Wilfert, Ross and Zavala then arrived.  (DSUF ¶¶ 9-10).  Rodriguez attempted
to calm Ramirez in Spanish.  (DSUF ¶ 9).  By this time Ramirez had sat down on the steps
leading up to the porch and was no longer moving around.  (DSUF ¶ 11).

At this point the Officer Defendants approached Ramirez and went "hands on."
(DSUF ¶ 11).  Plaintiffs contest the extent to which the officers formed a plan as to how to
approach and deal with Ramirez.  (Plaintiff's Statement of Genuine Disputes in
Opposition to Motion for Summary Judgment ("SGD"), ¶ 11 (Docket No. 59)).  It is
undisputed that the officers approached Ramirez in a compact group.  Rodriguez made
first contact with Ramirez and placed his hand on Ramirez's left shoulder and arm in an
attempt to put him in a "control hold" but Ramirez started to rise and slipped from
Rodriguez's grip.  (DSUF ¶ 12).  The officers together grabbed Ramirez by his arms and
legs and took him to the ground.  (DSUF ¶ 13).  There is a dispute as to how controlled
the officers were in taking Ramirez to the ground.  (SGD ¶¶ 13, 14).  Ramirez struggled
and the officers knelt on various portions of Ramirez's body to control him, including his
back, legs, shoulder, and pushed his head to the ground to control his movements against
the pavement.  (DSUF ¶ 14-15; SGD ¶ 15).

The Officer Defendants attempted to handcuff Ramirez.  In their attempts, Zavala
placed his weight on Ramirez's right shoulder and Sgt. Ramirez took Ramirez's right arm
and put it behind his back while Rodriguez handcuffed Ramirez's right hand.  (DSUF ¶
16).  Rodriguez then handed the handcuffs to Wilfert who put her right knee on the middle
of Ramirez's lower back.  (DSUF ¶ 17-18).  The Officer Defendants struggled to get
Ramirez's left hand out from underneath his body.  Brantner placed his baton in the crook
of Ramirez's left arm and attempted to lever it against Ramirez's back to get his hand out

from under him.  (DSUF ¶ 20).  At some point Brantner requested that other officers relieve some of the pressure being placed on Ramirez.  (SGD ¶ 20).  During this time Bocanegra crouched near Ramirez's shoulder holding his Taser against Ramirez, set to drive-stun mode.  (DSUF ¶ 21).

Ramirez continued to kick his legs after he was handcuffed, although the degree of his struggle is contested.  (SGD ¶ 22).  Wilfert removed a nylon "hobble" to restrain Ramirez's legs from her pocket, and with the help of Ross, placed it around Ramirez's ankles.  (DSUF ¶ 22).  During this process, Rodriguez, who had been straddling Ramirez's left leg, got his right leg caught between Ramirez's legs.  (DSUF ¶ 23).  The parties dispute how long it took Rodriguez to extract his leg.  Defendants contend it was 20 seconds, while Plaintiffs allege it was 30 to 40 seconds.  (DSUF ¶ 23; SGD 23).  After the hobble was placed on Ramirez he stopped struggling, and Ross suggested using a body wrap system to fully restrain Ramirez.  (DSUF ¶ 24; SGD ¶ 24).

At some point shortly after the hobble was placed, an officer noticed that Ramirez did not appear to be breathing.  (DSUF ¶ 30).  There was some evidence as to the difficulty Ramirez was having while breathing throughout the encounter, including statements by officers to relieve pressure, noises made by Ramirez that may have indicated asphyxiation issues, and instructions by officers to let Ramirez breathe.  (SGD ¶ 20).  Shortly after noticing that Ramirez was not breathing, Sgt. Terry Burr, not a defendant in this case, called the ambulance waiting nearby.  (DSUF ¶ 25).  Officers Zavala and Ramirez rolled him onto his side.  (DSUF ¶ 25).  The handcuffs were removed at the request of paramedics once they had arrived.  (DSUF ¶ 26).  The officers did not perform any first aid on Ramirez, but waited for the paramedics who were a short distance away.  The timing and length of many of the activities is contested by the parties.  (SGD ¶¶ 16-20, 22-25)  Viewed most favorably to Plaintiffs, the Officer Defendants were on top of Ramirez applying pressure while he was face down in various forms for about four minutes.  (SGD ¶ 15; Plaintiff's Statement of Additional Facts, ¶ 7 (Docket No. 59)).
///

1    Ramirez was transported to a hospital where he was declared dead.  (DSUF ¶ 27).

2    The Ventura County Medical Examiner determined that the cause of death was restraint

3    asphyxia.  Ramirez's body temperature was also measured at 105.6 degrees, a level

4    considered life-threatening. (DSUF ¶ 30).

5    This action was brought both as a survivor suit on behalf of Ramirez, and by

6    Ramirez's parents and minor child as individuals.  This action alleges claims against the

7    Officer Defendants as well as against the Oxnard Police Department, the City of Oxnard,

8    and Oxnard Police Chief Williams.

## II.   EVIDENTIARY OBJECTIONS

Defendants made a number of objections to the evidence presented by Plaintiffs in support of their Opposition.  (Defendants' Objections to Plaintiffs' Evidence Offered in Opposition to Defendants' Motion for Summary Judgment (the "Objections") (Docket No. 62).

### A. Objection No. 1

Defendants object to Plaintiffs' Exhibit A, a transcript of the 911 call that prompted Ramirez's encounter with the Officer Defendants.  (Objections at 2).  The Court could see little difference of any significance between Plaintiffs' non-certified transcript and Defendants' certified transcript provided in support of their Motion.  Whatever differences may have existed did not alter the Court's determination on the merits.  The Court therefore **OVERRULES** the objection as moot.

### B. Objection Nos. 2-5

Defendants object to interview reports provided by Thayer Private Investigators on the basis that they constitute hearsay and double hearsay in violation of Federal Rue of Evidence 801(a)(b)(c).  Defendant is correct that such reports are inadmissible.  The Court **SUSTAINS** Defendants' objections and does not consider the reports.

### C. Objection No. 6

Defendants object to the report by Ventura County Medical Examiner James Baroni, on the basis that it constitutes hearsay and double-hearsay.  (Objections at 3).  The

1    Court, however, may consider evidence on summary judgment even if its form would be

2    inadmissible provided the Court believes the content would be admissible at trial. *Fraser*

3    *v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (holding that diabetes is a physical

4    impairment, and eating is a major life activity under the ADA such that a triable issue

5    existed as to plaintiff's limitation in major life act to support a claim under the ADA).

6    The Court believes that this would be true of the relevant portions of Baroni's report.

7    Further, the Court also believes that the report might be admissible as a government

8    record. Fed. Rule of Evid. 803(8). The objection is therefore **OVERRULED**.

9        **D. Objection Nos. 7-9**

10       Defendants object to various excerpts from the deposition testimony of Dr. Ronald

11   O'Halloran and his opinion letter. (Objection at 4). Defendants argue that the deposition

12   testimony as to the cause of death lack foundation because it was based on insufficient

13   facts or data to qualify as expert testimony. They complain that other testimony is

14   selectively chosen and is misleading. Finally, O'Halloran's report lacks evidentiary

15   support upon which he can base his opinions and there is no showing that the opinions

16   expressed are based upon sufficient facts or data, or they are the product of reliable

17   principle or methods. The Court does not view O'Halloran's opinions expressed in the

18   deposition to be so devoid of a factual basis to exercise its broad discretion as a gatekeeper

19   to warrant excluding them from its consideration. Further, as to O'Halloran's report,

20   much of the relevant content of it is very likely to be admissible at trial, even if the report

21   itself will not be, and so it is properly considered. Defendants' Objections are therefore

22   **OVERRULED.**

23   **III.   DISCUSSION**

24       In deciding this Motion under Rule 56, the Court applies *Anderson*, *Celotex*, and

25   their Ninth Circuit progeny. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477

26   U.S. 242, 248, (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *In re*

27   *Oracle Corp. Securities Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) ("Where the non-moving

28   party bears the burden of proof at trial, the moving party need only prove that there is an

absence of evidence to support the non-moving party's case.").  The non-moving party may not simply rely on allegations in its pleadings but must identify specific facts raising a genuine dispute that will be material at trial.  Fed. R. Civ. P. 56(c).

Plaintiffs bring a number of claims against the various Defendants.  Plaintiffs' Second Amended Complaint ("SAC") asserts 10 claims, separated into six survival claims and four claims brought by Ramirez's family members individually.  The claims are also appropriately separated between those against the Officer Defendants directly involved in Ramirez's death, and Chief Williams, the Oxnard Police Department, and the City of Oxnard who are sued on the basis of their failure to adequately supervise, screen, train and reprimand the Officer Defendants responsible for Ramirez's death.

The claims, however, are premised on the first two claims, both brought under 42 U.S.C. § 1983 for use of excessive force in violation of the Fourth Amendment brought against the Officer Defendantss (SAC ¶¶ 66-74), and for deliberate indifference to serious medical needs in violation of the Fourth and Fourteenth Amendments.  (SAC ¶¶ 75-90). The Court will therefore address those claims first.

A. <u>**First and Second Claims for Relief: Excessive Force and Deliberate Indifference to Medical Need**</u>

In their Motion, Defendants argue that the Officer Defendants' actions did not violate Ramirez's constitutional rights.  (Motion at 13).  Further, even if they did, Defendants argued that the Officer Defendants are entitled to qualified immunity because they reasonably believed that their actions were reasonable in light of clearly established law.  (Motion at 17).

An evaluation of an official's entitlement to qualified immunity involves two questions.  First, whether, "taken in the light most favorable to the party asserting the injury . . . the facts alleged show [that] the officer's conduct violated a constitutional right." *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (holding that officers' use of continual force to press individual down resulting in asphyxiation was a constitutional violation for which officers

did not enjoy qualified immunity).  Second, whether the right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful given the context of his actions.  *Id.*  After the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223 (2009), district courts no longer have to address the questions in that order. The Court in this instance, however, determines it most helpful to first evaluate whether the actions by the Officer Defendants constitute a violation of the Fourth Amendment.

In evaluating a Fourth Amendment claim of excessive force, the Court uses the framework set forth by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989) (holding that all claims alleging excessive force under the Fourth Amendment are evaluated by objectively reasonably standard).  The Court must determine whether the force used was objectively reasonable.  *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001) (citing to *Graham*, 490 U.S. at 397) (holding that firing of beanbag from a short distance at mentally ill subject was constitutional violation for which officer did not enjoy qualified immunity).  To determine whether the force used was reasonable, the Court balances the "nature and quality of the intrusion on an individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396.  The Ninth Circuit has cautioned that "[b]ecause such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment . . . in excessive force cases should be granted sparingly."  *Drummond*, 343 F.3d at 1056 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (holding that excessive force claim could be maintained by paranoid schizophrenic who did not recall precise acts by agent and question of whether acts were excessive force were a question for jury)).

### 1. Nature of the Force Applied

The Court must first assess the type and amount of force inflicted.  *Drummond*, 343 F.3d at 1056.  The extent and length of the various forms of force applied to Ramirez during the encounter are disputed by the parties.  However, the undisputed facts indicate that at a number of police officers approached Ramirez, attempted to go "hands on" and

when he stood up at their initial contact converged on him and brought him to the ground. They proceeded to place themselves on top of him at various places while they attempted to handcuff and incapacitate him.  Many of the Officer Defendants placed their weight on his back and shoulders. inducing Ramirez's breathing difficulty.  An officer also used a baton to lever between Ramirez's elbow and back to get his left hand out from under him.

The evidence shows that numerous officers exerted significant force, first in bringing Ramirez to the ground, and then applying the handcuffs and hobble.  Evidence suggests that this use of force caused Ramirez to suffer from compression asphyxiation and ultimately die.  While the Defendants suggest that his high body temperature and his drug ingestion could have caused his death, Plaintiffs present sufficient evidence to create a triable issue on the question, and in evaluating qualified immunity, factual inferences are made in favor of the party claiming injury.  *See Saucier*, 533 U.S. at 201 (facts must be "[t]aken in the light most favorable to the party asserting the injury" in determining whether officer committed constitutional violation).

### 2.  Minimal Need for Force

Against the use of force the Court balances the "*need* for that force" by considering the government interests in question.  *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) (quoting *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir.1997)) (holding on remand from Supreme Court for reconsideration that officers who used pepper spray on peaceful protesters were not entitled to qualified immunity against excessive force claims).  The Supreme Court in *Graham* explained that the government interest in safely effecting an arrest must be "examined in light of the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Santos*, 287 F.3d at 854 (quoting *Graham*, 490 U.S. at 396).  The Ninth Circuit has also held that a detainee's mental disturbance must be reflected in any assessment of the government's interest in the use of force.  *Drummond*, 343 F.3d at 1058; *Deorle*, 272 F.3d at 1282-82.

In evaluating these factors, the Court determines that the government had only a very moderate need for force: *First*, there was no crime at issue. Ramirez was not being detained because he was the suspect in a crime. The police became involved only out of concern for Ramirez's own health and safety as prompted by Arturo Pedro's phone call. *Second*, there is little evidence that Ramirez posed an immediate threat to the safety of the Officer Defendants or others. Ramirez was acting in an agitated manner, flailing his arms and appeared to be disturbed. However, there is no evidence that he posed an immediate physical danger to any person or officer. Indeed, when the Officer Defendants first approached him, he was sitting on the porch. In his state the Officer Defendants may have believed that he posed some danger, primarily to himself. However, Defendants only assert that due to his size and build he posed a danger to the officers and paramedics if "he decided to charge at the officers." (Reply at 10). There is at the least a question of fact as to whether Ramirez posed any danger that required the Officer Defendants to go "hands on" and use the force they did. *Third*, Ramirez did resist the attempts of the Officer Defendants to detain him once they went "hands on" although Plaintiffs contest the degree and length of the resistance.

The Ninth Circuit in *Deorle*, and again in *Drummond*, recognized that the government's interest in using force against a mentally ill person was substantially diminished compared to a violent and dangerous criminal, even should that individual be inviting the use of deadly force. *Deorle*, 272 F.3d at 1283 ("we emphasize that where it is, or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed"); *Drummond*, 343 F.3d at 1058 ("we have held that a detainee's mental illness must be reflected in any assessment of the government's interest in the use of force"). While Ramirez was not mentally ill, his mental state at the time of his encounter with the Officer Defendants was such that the Court sees considerable similarities between the situation the Officer Defendants encountered and that encountered by officers in approaching an individual suffering from mental illness

where no crime has been committed.  The Court therefore considers the factor to counsel against the use of force to resolve the situation.

### 3.  Balancing the Use of Force With Force Needed

The role of the Court is to balance whether the Officer Defendants' substantial use of force against the government's very modest interest in using force "amounts to determining whether the force employed was greater than is reasonable under the circumstances." *Drummond*, 287 343, F.3d at 1058 (citations omitted).  The Supreme Court has cautioned that this determination must be made "from the perspective of a reasonable officer on the scene" and take into account that "officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation. *Graham*, 490 U.S. at 396-97.  However, even where use of force is justified, the quantum used must still be reasonable. *Drummond*, 343 F.3d at 1058; *Santos*, 287 F.3d at 853.

In light of the circumstances, some measure of force may have been justified. *See, e.g. Drummond*, 343 F.3d at 1058.  However, the Court cannot conclude that, as a matter of law, a jury could not properly find a Fourth Amendment violation.  Six police officers swarmed an agitated, but sitting and non-threatening Ramirez, bringing him to the ground in a violent manner.  They then placed themselves on top of him such that he had difficulty breathing and ultimately died from asphyxiation.  Plaintiffs contend these actions constitute unreasonable and excessive force.

Defendants cite to a number of out-of-circuit cases in an attempt to show that the force used by Officer Defendants was not unreasonable as a matter of law.  First Defendants contend that the Third Circuit's unpublished decision in *Bornstad v. Honey Book Township*, 211 Fed. Appx. 118 (3d. Cir. 2007) shows that Officer Defendants' actions were reasonable because Ramirez, like the plaintiff in *Bornstad*, resisted the police's attempts to restrain him.  However, the circumstances were substantially and importantly different, and indeed, the court found all three *Graham* factors weighed in favor of the defendants.  That conclusion does not apply here.  The encounter in *Bornstad*

started with suspicion of Bornstad engaging in domestic abuse, and took place while attempting to arrest him for a crime the court viewed as "serious." *Id*. at 123. In addition, the plaintiff in *Bornstad* initiated the physical contact and wrestled the officers to the ground, which posed an immediate and specific danger to the officers. Neither factor was present in the Officer Defendants' encounter with Ramirez, who was not being arrested and did not engage in direct physical contact with the police until he started struggling once the officers swarmed him.

Similarly, Defendants' reliance on *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997) is unavailing. (Reply at 7-8). The officers in *Phillips* encounter the plaintiff in his apartment where he was very agitated. He had thrown fans out of his apartment window which had landed on the pavement below, and was clenching pens in both hands, which the police perceived to pose a significant threat as weapons. *Id*. In *Phillips*, the plaintiff therefore posed an immediate danger to the officers and to the general public justifying a much more significant use of force under the Fourth Amendment.

Defendants also contend that this case is readily distinguishable from *Drummond*. In *Drummond* officers were summoned to deal with a mentally ill man who had not taken his medication. 343 F.3d at 1054-55. They called for an ambulance but decided to take him into custody first. *Id*. at 1054. While Drummond struggled initially, he was handcuffed while lying in a prone position and stopped struggling. *Id.* Despite this lack of struggle, two large officers continued to sit on Drummond for twenty minutes while he pleaded that he could not breathe. *Id*. During those twenty minutes other officers standing around joked and laughed. *Id*. at 1055. Drummond suffered asphyxiation and stopped breathing. *Id.* Despite being revived he suffered serious brain damage and slipped into a coma. *Id.* On appeal from the district court's grant of summary judgment to the defendants, the Ninth Circuit reversed. *Id.* at 1054.

There are certainly some factual distinctions, as are expected in different cases. For one, the excessive force identified as particularly problematic by the *Drummond* court was

the officers sitting on Drummond after he had been handcuffed and had stopped struggling.  In the present case, the evidence suggests that Ramirez continued to struggle, at least to some extent, while the officers attempted to handcuff him.  The length of time of the alleged compression is also substantially different.

However, *Drummond* is distinguishable also because the Ninth Circuit ruled that the activity constituted excessive force as a matter of law and did not require a jury's consideration of the reasonableness of the response.  That the Officer Defendants' actions are not as severe as those in *Drummond* does not mean they are not also excessive. In the present case, the Court cannot say as a matter of law that a jury could not conclude that the actions taken by the Officer Defendants against a disturbed – but non-threatening – individual for the purpose of assisting him were not excessive, especially where the *Graham* factors seem to counsel against the use of substantial force.

Indeed, there is significant case law within this Circuit holding that similar actions against individuals leading to positional asphyxiation constitute excessive force or at the least present a question for jury determination.  *See, e.g.*, *Drummond*, 343 F.3d at 1058; *Brown v. City and County of San Francisco*, No. C 11-02162 LB 2012 WL 159941, at *11 N.D. Cal. Apr. 7, 2014) ("If the fact finder were to find that [a suspect in custody] died 'as a result of asphyxia caused by restraint in prone position with pressure on his back coupled with a neck hold,' a reasonable juror could find that this constituted excessive force."); *Gabales v. County of San Joaquin*, No. CIV. S-07-1346LKKDAD, 2009 WL 2923037, at *9 (E.D. Cal. Sept. 4, 2009) (holding that despite suspicion of subject's commission of felony and flight from officers, question as to whether defendants' actions causing asphyxiation amounted to excessive force was a matter for jury to decide). Indeed, in some of these cases officers engaged in similar acts against subjects where the *Graham* factors indicated significantly greater force would have been reasonable.

Here, the first two *Graham* factors strongly counsel against force, while the third, only slightly favors a use of force.  Defendants identify no case where the *Graham* factors counseled so strongly for only the minimal use of force and where the force allegedly used

-13-

1  was similar to the significant force used by Officer Defendants against Ramirez, but the

2  court nonetheless granted summary judgment.  As such, the Court cannot conclude that

3  this is one of those rare cases where the undisputed facts are such that Defendants are

4  entitled to summary judgment.  *See, e.g., Chew, v. Gates*, 27 F.3d 1432, 1443 (9th Cir.

5  1994) (Most important factor – threat to others and officers – strongly favored plaintiff,

6  while other two slightly favored defendants did not make defendants' judgment

7  reasonable as a matter of law, and therefore the question should be submitted to a jury).

8      Defendants also contend that the Court should consider their conduct individually,

9  rather than as a group.  If this is done, they contend, the undisputed facts show that all the

10  officers, perhaps barring Wilfert, used only appropriate force because they merely held

11  down Ramirez's extremities and could not thereby have caused his compression asphyxia.

12  Plaintiffs maintain that by acting as a group, and "swarming" Ramirez they should all be

13  liable, although at the hearing counsel did concede that their argument is weaker against

14  Bocanegra who stood back with his Taser pressed against Ramirez's shoulder should it be

15  needed.  (DSUF ¶ 21).

16      Defendants, however, are incorrect in stating the law on the Officer Defendants'

17  liability for group activity under § 1983.  The Ninth Circuit has held that "a person

18  'subjects' another to the deprivation of a constitutional right, within the meaning of §

19  1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to

20  perform an act which he is legally required to do that causes the deprivation of which

21  complaint is made.'"  *Preschooler II v. Clark County School Board of Trustees*, 479 F.3d

22  1175, 1183 (9th Cir. 2007) (holding that supervisor was liable for disregarding

23  responsibilities in hiring, training and supervising abuses committed by teacher) (quoting

24  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978)).  The Ninth Circuit has rejected a

25  finding of a "team effort" to be sufficient to impose liability but has stated that either

26  "integral participation" or "personal involvement" could be sufficient for a jury to find

27  officers liable.  *Chuman v. Wright*, 76 F.3d 292 (9th Cir. 1996) (rejecting jury instruction

28  ///

that allowed a finding of liability based only on being a bystander under a "team effort" theory).

Directly on point is the Ninth Circuit's decision in *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004).  In *Boyd*, the Ninth Circuit clarified the rule regarding "integral participation" initially adopted from the Fifth Circuit's case in *Melear v.* Spears, 862 F.2d 1177 (5th Cir. 1989).  The court addressed a situation where an officer threw a flash-bang grenade into a room in violation of the Fourth Amendment.  The court rejected the argument that only the officer who threw the grenade could be liable explaining that "'integral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation," and so officers standing directly behind the officer who threw the grenade were sufficient participants to also be liable.  *Id.* at 780.  In doing so, *Boyd* clarified the holding in *Chuman*, where the Ninth Circuit ruled that a jury instruction was erroneous where the instruction suggested that liability could attach to bystander officers on the basis of a "team effort," without any consideration of an individual officer's own conduct.  *Id.*  As made clear in *Boyd*, it is necessary to consider the actions of each individual defendant, but those actions on their own need not arise to the level of a constitutional violation for the officer to be liable.  *Id.*

The court further explained that precedent established that officers who provided armed backup during an unconstitutional search were "integral" to that search, making them participants and not mere bystanders, as was an officer who does not enter an apartment, but stands at the door armed with a gun.  *Id.* (citing *James ex rel. James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (officers providing backup during unconstitutional search were integral and therefore potentially liable participants); *Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989) (officer standing guard at the door was a "full, active participant" in the search)).

In light of these cases, the Court rejects Defendants' argument that the Court must grant summary judgment to the officers whose actions, by themselves, do not rise to the level of a constitutional violation.  The relevant question is whether the individual

1    officer's actions made him an integral participant in the alleged constitutional violations.

2    Under the rule laid out in *Boyd*, the Court concludes that all of the Officer Defendants,

3    including Bocanegra, were integral participants in the force used on Ramirez.  While

4    Bocanegra was not part of the group who actually took Ramirez to the ground, he stood

5    armed overlooking the struggle, and at one point pressed his Taser against Ramirez's

6    shoulder should it have been needed.  (DSUF ¶ 21).  A jury may or or may not find that he

7    was as much a participant in the police contact with Ramirez as those who actually held

8    him down.

9    **B. <u>The Constitutional Violation was Clearly Established</u>**

10        Because the Court determines that summary judgment may not be granted as to the

11   fact of a constitutional violation, the Court must determine whether the Officer

12   Defendants are nonetheless entitled to qualified immunity because the violation was not

13   clearly established.  The Court determines that the violation was clearly established.

14        In determining whether that right was clearly established at the time of the incident,

15   the Court considers "whether the state of the law at the time of the alleged wrong gave the

16   defendants fair warning that their alleged treatment of the plaintiff was unconstitutional."

17   *Davis*, 478 F.3d at 1056 (citations omitted).  There have been a number of cases within the

18   Ninth Circuit establishing that "keeping an individual who is in a state of excited delirium

19   restrained with his chest to the ground while applying pressure to his back and ignoring

20   pleas that he cannot breathe" is the use of excessive force.  *See Drummond*, 343 F.3d at

21   1056-57; *Arce v. Blackwell*, 294 Fed. Appx. 259, 261 (9th Cir. 2008) (upholding denial of

22   summary judgment motion brought by defendants in case involving positional

23   asphyxiation); *Gabales*, 2009 WL 2923037 at *11 (holding that "the officers here were on

24   notice of the potentially lethal effect of kneeling on or compressing a suspect's back while

25   he lay prone"); *Brown*, 2014 WL 1364931, at *14 (holding that law regarding positional

26   asphyxiation was clearly established even as it related to force used on struggling suspect

27   within police cell) (citing to *Drummond* and *Arce*).

28   ///

-16-

The law that an officer's actions as a participant in a constitutional violation may give rise to liability without themselves rising to the level of a violation was clearly established by *Boyd* in 2004, and so was clearly established at the time of the encounter.

Therefore, the Officer Defendants are not entitled to qualified immunity.

Accordingly, the Court **DENIES** Defendants' Motion as to Plaintiffs' first and second claims for relief.

## C. **Plaintiffs' Fourteenth Amendment Claims**

Ramirez's parents and offspring, Guillermo and Teresa Ramirez, and R.R., assert claims under the Fourteenth Amendment for the violation of their substantive due process clause rights through the actions of Defendants in causing the death of Ramirez.

Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (holding that officer was entitled to summary judgment on claims brought by suspect he had shot while in a stolen car where he reasonably feared for safety of other officers). Official conduct only amounts to a due process violation when it "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)) (holding that purpose-to-harm analysis applied to officer shooting when officer was engaged in evolving situation involving suspect in moving car).

In determining whether excessive force shocks the conscience, the Court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical." *Id*. at 1137 (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998). The "heightened purpose-to-harm standard applies where a suspect's evasive actions force the officers to act quickly." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (holding that situation where situation rapidly evolved from car chase to a vehicle bearing down on officers on foot required application of "purpose-to-harm" standard). The Ninth Circuit treats the "shocks the conscience" test as one involving a

spectrum between a "deliberate indifference" standard and a "purpose to harm" standard. See *Porter*, 546 F.3d at 1137. "[T]he critical question in determining the appropriate standard of culpability is whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Moreland*, 159 F.3d at 373 (citations omitted).

"Under the Fourteenth Amendment, . . . a denial of due process 'is to be tested by an appraisal of the totality of facts in a given case.'" *Id*. at 1141 (citing *Lewis*, 523 U.S. at 850). This analysis is fact-intensive and is similar to the reasonableness test required in Fourth Amendment excessive force actions. *Id*. Indeed, an officer's "motives must . . . be assessed in light of the law enforcement objectives that can reasonably be found to have justified his actions." *Id*.

When the Officer Defendants first arrived at the scene, Ramirez appeared agitated but there is no evidence that he was an immediate threat to any person. By the time the officers had decided to go "hands on," Ramirez was sitting on the porch steps. Unlike in a rapidly evolving situation such as a high-speed car chase, the Officer Defendants had sufficient time to assess the situation, "fully consider the potential consequences of their conduct" and formulate a plan to deal with Ramirez. It was the conduct of the Officer Defendants in going "hands on" that escalated the situation. Given the time the Officer Defendants had to assess the situation, the appropriate standard to apply in determining whether Plaintiffs' Fourteenth Amendment claims should be denied as a matter of law is whether the Officer Defendants' conduct was deliberately indifferent and Plaintiffs' need not show that the officers had an intent to harm Ramirez in their actions.

Based on its conclusions above as to the nature of the Officer Defendants' use of force, the Court cannot conclude – as a matter of law -- that the Officer Defendants' actions were not deliberately indifferent. *See*, *e.g., Porter*, 546 F.3d at 1141 ("This is the kind of analysis applied in the analogous jurisprudence governing constitutional claims of excessive force under the Fourth Amendment.").

///

The Court therefore **DENIES** Defendants' Motion as to Plaintiffs' Fourteenth Amendment claims contained in the second, seventh, eighth and ninth claims for relief.

### D. **Plaintiffs' State Law Claims**

Plaintiffs bring claims for assault, battery and wrongful death under California state law. These claims are analyzed under the same standard of objective reasonableness used in Fourth Amendment claims. *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527, 89 Cal. Rptr. 3d 801 (2009) (affirming grant of summary judgment for defendant because officer's accidental shooting of bystander was based on a reasonable decision based on law enforcement necessity); *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1102, 16 Cal. Rptr. 3d 521 (2004) (upholding jury's determination that decision to use deadly force was unreasonable because plaintiff presented adequate evidence to support such a decision at trial).

Therefore, because Defendants' Motion must be denied as to Plaintiffs' first and second claims for relief, it must also be **DENIED** as to Plaintiffs' fifth, sixth and tenth claims for relief.

### E. **Plaintiffs' *Monell* Claims**

Plaintiffs also bring claims against the Oxnard Police Department and the City of Oxnard for liability for the officers' violation of Ramirez rights under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

A local government may be held liable under § 1983 for acts of "omission," when such omissions amount to the local government's own official policy. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010) (claim against county failed because county did not have longstanding practice of moving pretrial detainees from observation cells to general population without consulting mental health staff). To impose liability on a local government for failure to adequately train its employees, the government's omission must amount to "deliberate indifference" to a constitutional right. This standard is met when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city

can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (held that where detainee asserts municipal liability for failure to provide constitutional right to medical care while in custody, plaintiff must show deliberate indifference to her need in its failure to train).

Plaintiffs present evidence that Oxnard Police Department officers do not receive training on certain specifics as to the dangers of positional asphyxiation by officer compression or when dealing with subjects exhibiting signs of agitated or excited delirium.  (Opposition at 20).  Plaintiffs' evidence however is limited to very particular gaps in individual officers' memory of their training, whereas the deposition testimony of other officers suggests that they had training in those areas.  (SGD ¶ 32).  As the Supreme Court explained in *Harris* "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."  *Harris*, 489 U.S. at 390-91.  Indeed, the evidence presented by Defendants, and uncontested by Plaintiffs is that the Oxnard Police Department's training procedures exceeded well-established standards in California, and Plaintiffs' own evidence showed that the officers had substantial training on positional asphyxia.  Plaintiffs therefore cannot show that the lack of training was "so likely to result in the violation of constitutional rights" that the municipality can be deemed to have been deliberately indifferent to Plaintiffs' rights.  *Harris*, 489 U.S. at 390.  The little evidence presented by Plaintiffs is insufficient to meet that standard.

Accordingly, the Court **GRANTS** Defendants' Motion as to claims three, four, eight and nine.

### F.  Claims Against Chief Williams

Defendants argue that Plaintiffs fail to present sufficient evidence to show that Chief Williams is liable as a supervisor for the alleged violations of the Officer Defendants.  (Motion at 24).  "A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful

conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (citations omitted) (holding that supervisor liability was sufficiently alleged were that sheriff failed to act to protect inmates under his care despite his knowledge that they were in danger because of culpable acts of his subordinates and his ability to take actions that would have protected them). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998).

Plaintiffs argue that the evidence indicating a failure to train is sufficient to establish the necessary causal connection between Chief Williams's alleged wrongful conduct and the constitutional violation.  (Opposition at 22).  In support of their position they cite to *Starr v. Baca* where the Ninth Circuit held that a plaintiff sufficiently alleged supervisory liability where Chief Baca had been aware of actions by deputies under his control and the danger these actions posed to inmates but failed to act.  652 F.3d at 1216-17.  Plaintiffs present no similar evidence of any particular knowledge held by Chief Williams of the risks posed by her officers or how her failure to act is causally related to the actions of the Officer Defendants.

Accordingly, the Court **GRANTS** Defendants' Motion as to Chief Williams in its entirety.

## IV.   **CONCLUSION**

For the reasons stated above, the Court **DENIES** summary judgment in favor of the Officer Defendants, but **GRANTS** summary judgment in favor of the City of Oxnard, the Oxnard Police Department, and Chief Jeri Williams.  Specifically, the Court rules as follows:

First Claim for Relief for Violation of Civil Rights under 42 U.S.C. § 1983 (use of Excessive Force in violation of Fourth Amendment) against Defendants Steven Ramirez, ///

Michael Bocanegra, Roslynn Wilfert, Pedro Rodriguez, Aaron Zavala, Kyle Brantner and Matthew Ross: **DENIED.**

Second Claim for Relief for Violation of Civil Rights under 42 U.S.C. § 1983 (Deliberate Indifference to Serious Medical needs in violation of Fourth and Fourteenth Amendment) against Defendants Steven Ramirez, Michael Bocanegra, Roslynn Wilfert, Pedro Rodriguez, Aaron Zavala, Kyle Brantner and Matthew Ross: **DENIED.**

Third Claim for Relief for Municipal Liability under 42 U.S.C. § 1983 (Deliberate Indifference Causing Constitutional Violations) against Defendants Jeri Williams, Oxnard Police Department and the City of Oxnard: **GRANTED**.

Fourth Claim for Relief for Municipal Liability under 43 U.S.C. § 1983 (Failure to Screen, Train, Supervise and Reprimand Causing Constitutional Violations) against Defendants Jeri Williams, Oxnard Police Department and the City of Oxnard: **GRANTED**.

Fifth Claim for Relief for Assault against Defendants Steven Ramirez, Michael Bocanegra, Roslynn Wilfert, Pedro Rodriguez, Aaron Zavala, Kyle Brantner and Matthew Ross: **DENIED**.  Against Defendants Jeri Williams, Oxnard Police Department and the City of Oxnard: **GRANTED**.

Sixth Claim for Relief for Battery against Defendants Steven Ramirez, Michael Bocanegra, Roslynn Wilfert, Pedro Rodriguez, Aaron Zavala, Kyle Brantner and Matthew Ross: **DENIED**.  Against Defendants Jeri Williams, Oxnard Police Department and the City of Oxnard: **GRANTED**.

Seventh Claim for Relief for Violation of Civil Rights under 42 U.S.C. § 1983 (State Interference with Familial Relationship in violation of Fourteenth Amendment) against Defendants Steven Ramirez, Michael Bocanegra, Roslynn Wilfert, Pedro Rodriguez, Aaron Zavala, Kyle Brantner and Matthew Ross: **DENIED.**

Eighth Claim for Relief for Municipal Liability under 42 U.S.C. § 1983 (Deliberate Indifference Causing Constitutional Violations) against Defendants Jeri Williams, Oxnard Police Department and the City of Oxnard: **GRANTED**.

1    Ninth Claim for Relief for Municipal Liability under 42 U.S.C. § 1983 (Failure to

2  Screen, Train, Supervise and Reprimand Causing Constitutional Violations) against

3  Defendants Jeri Williams, Oxnard Police Department and the City of Oxnard:

4  **GRANTED**.

5    Tenth Claim for Relief for Wrongful Death against Defendants Steven Ramirez,

6  Michael Bocanegra, Roslynn Wilfert, Pedro Rodriguez, Aaron Zavala, Kyle Brantner and

7  Matthew Ross: **DENIED**.  Against Defendants Jeri Williams, Oxnard Police Department

8  and the City of Oxnard: **GRANTED**.

9    IT IS SO ORDERED.

10

11  Dated:  December 16, 2014    _____

12                  MICHAEL W. FITZGERALD
                    United States District Judge

-23-